HICKORY ORTHOPAEDIC CENTER, P.A., ORTHOPAEDIC CENTER ASSOCIATES, P.E. BROWN, H. GREY WINFIELD, III, WILLIAM M. PEKMAN, MARK R. McGINNIS, PETER T. HURLEY, AND JEFFREY A. KNAPP, PLAINTIFFS-APPELLANTS v. C. MICHAEL NICKS, DEFENDANT-APPELLEE

No. COA05-386

(Filed 5 September 2006)

**1. Corporations— stock agreement—valuation—agreement followed**

The trial court was bound to follow the valuation of stock agreed upon by the parties in a stock agreement regardless of whether the value appeared high or low compared to the original purchase price.

**2. Corporations— stock purchase agreement—medical practice—intangible assets and inventory**

The trial court correctly determined that the intangible assets and inventory of a medical practice were to be considered in the computation of the value of defendant's stock where there was a conflict between "book value" and "net book value" in the stock agreement. "Net book value" was included only to emphasize that debts and depreciation were to be deducted in the computation of book value; it was not the intent of the parties to limit the computation of book value to fixed assets.

**3. Corporations— stock agreement—valuation of stock— agreement not ambiguous—prior course of conduct not considered**

The language of a stock agreement was not ambiguous with respect to the proper method of valuation for a corporation's stock, and the trial court did not err by not considering prior course of conduct in interpreting the intent of the parties. Moreover, the one instance of prior conduct cited was not compelling, and specific findings on this issue were not required.

**4. Corporations— stock agreement—medical practice—valuation by practice's CPA**

The trial court did not err by not complying with language in a medical practice's stock agreement requiring that the value of the stock be calculated by the CPA regularly retained by the corporation. One of the doctors performed the calculation without considering intangible assets; since plaintiff chose not to comply with the provisions of the agreement and offered at trial no evidence that its CPA had performed the computation, it could not complain on appeal that the court did not require that the computation be performed by its CPA.

**5. Corporations— stock agreement—valuation—findings not sufficient**

The trial court's findings of fact about the valuation of stock in a medical practice were not sufficient for appellate review and did not support its conclusions. The witness upon whom the court relied testified that his calculation of inventories was simply an estimate based upon information supplied to him by defendant, gave no testimony about how he calculated accounts receivable, and admitted that his role was simply to provide calculations based upon a set of assumptions.

**6. Physicians and Surgeons— disability—findings**

There was competent evidence in the record to support a trial court's findings that a doctor was disabled when he was terminated from his practice, which affected his severance pay.

**7. Physicians and Surgeons— disabled doctor—repurchase of stock by practice**

The trial court did not err by making mandatory the repurchase of stock from a disabled doctor by his former practice. The practice's stock agreement gave the practice the option of pur-

chasing the stock, which the practice exercised by seeking a court order to compel defendant to sell the stock. The practice did not have the option of refusing the purchase because it disagreed with the court's valuation of the amount.

**8. Physicians and Surgeons— disabled doctor—severance pay**

The trial court did not err by awarding severance pay to a disabled doctor where the plain language of the practice's stock agreement applied to stockholders terminated for permanent disability.

**9. Physicians and Surgeons— severance pay—calculation**

There was no showing of error or prejudice in a medical practice's argument that the trial court erred by accepting the calculation of severance pay for a disabled doctor made by the doctor's accountant rather than the practice's CPA.

**10. Parties— multiple claims and parties—dismissal and counterclaim—joint and several liability**

The trial court erred in the parties against whom judgment was entered on a counterclaim involving compensation to a doctor who was terminated from a medical practice. One of the original claims was voluntarily dismissed before the counterclaim was filed, so that only the practice and neither the individual plaintiffs nor the real estate partnership remained as a plaintiff; furthermore, the practice was not a party to the real estate partnership. The court had no authority over the individual defendants or the partnership and no judgment against the practice under the partnership agreement may be enforced. Judgment against the practice and the individual plaintiffs jointly and severally should not have been entered.

Appeal by plaintiffs from judgment entered 21 July 2004 by Judge David S. Cayer in Catawba County Superior Court. Heard in the Court of Appeals 29 November 2005.

*Patrick, Harper & Dixon LLP, by David W. Hood and Michael P. Thomas, for plaintiffs-appellants.*

*Van Hoy, Reutlinger, Adams & Dunn, by Craig A. Reutlinger and Philip M. Van Hoy, for defendant-appellee.*

STEELMAN, Judge.

Plaintiffs appeal from the trial court's decision in a non-jury trial awarding damages to defendant for breach of a shareholder agreement and a real estate partnership agreement. We affirm the decision of the trial court in part and vacate and remand in part.

Defendant was hired by Hickory Orthopaedic as an employee orthopaedic physician in July of 1990. In 1992 defendant became a shareholder in Hickory Orthopaedic, and executed a stock agreement which restricted the ability of plaintiff and the other shareholders to sell their stock. Defendant paid $1000.00 for his stock in Hickory Orthopaedic. In August of 1994 defendant and Hickory Orthopaedic executed a new stock agreement, which was still in effect when defendant's employment with Hickory Orthopaedic was terminated on 1 July 2002. Under the terms of this agreement, Hickory Orthopaedic had the option to purchase a departing stockholder's stock in the corporation under certain circumstances, and had a obligation to purchase a departing stockholder's interest in other circumstances. Defendant was also a partner, along with the other shareholders of Hickory Orthopaedic, in Orthopaedic Center Associates, which owned the land and building where Hickory Orthopaedic is located.

While defendant was employed by Hickory Orthopaedic, his behavior was at times inappropriate. This behavior included temper outbursts and an extramarital affair with a co-worker. Defendant was confronted concerning this conduct by other Hickory Orthopaedic shareholders in January of 2002. Defendant was informed that he risked termination unless he agreed to seek an evaluation by the Physician Health and Effectiveness Program and agreed to comply with its recommendations. Defendant obtained the required evaluation, which determined that defendant was not disabled and could continue the practice of medicine, but recommended that defendant reduce his work hours, seek regular psychotherapy, and take a leave of absence to attend programmatic group therapy sessions. Defendant chose not to comply with these recommendations.

On 5 April 2002, following a planned vacation, defendant's attorney faxed a letter to Hickory Orthopaedic stating that defendant would not be able to return to work. The letter did not indicate the length of time defendant would be unable to work. At this time, the parties entered into discussions concerning the rights and obligations of the parties under the shareholder and partnership agreements in

the event of defendant's departure, but were unable to reach an agreement. On 28 June 2002, defendant's attorney sent a letter to Hickory Orthopaedic stating that defendant was disabled due to clinical depression, and that this condition was likely to persist for the foreseeable future. A letter from defendant's physician was to have been faxed along with the letter from defendant's attorney, but was not successfully sent and received until a few days later. In this letter, defendant's physician stated that defendant suffered from chronic major depression which rendered him "unable to continue a busy practice as a physician."

Hickory Orthopaedic terminated defendant's employment on 1 July 2002. The letter of termination did not state the reason for termination. Pursuant to paragraph 6 of the stock agreement, Hickory Orthopaedic had the *option* to purchase defendant's stock upon termination of employment. However, under the provisions of paragraph 5 of the stock agreement, it was *required* to purchase the stock of a shareholder upon their death, disability, or retirement. Further, if defendant ceased work due to disability, Hickory Orthopaedic was required to pay him one year of severance pay in monthly installments. This amount was to be the amount of collections of the withdrawing shareholder's accounts receivable balance, adjusted for certain items. In the event that there was a dispute over whether a shareholder was permanently disabled, the issue would be submitted to a panel of three doctors, psychologists or psychiatrists.

In the event Hickory Orthopaedic purchased defendant's shares, paragraph 3 of the agreement provided that the price would be the "pro-rata value of the share or shares of stock of the Stockholder whose interest is being purchased, to the total book value of all of the issued and outstanding shares of stock of the Corporation as is determined by the regularly retained Certified Public Accountant of the Corporation." The agreement does not define "total book value," but does contain definitions for "book value" and "net book value." These definitions are materially different, but the agreement states that they are to be used interchangeably and have the same meaning.

On 25 October 2002, plaintiffs filed a complaint alleging defendant's breach of both agreements, and seeking an order of the court compelling defendant to specifically perform his obligations under the agreements. With respect to the Orthopaedic Center Associates agreement, it was alleged that the defendant's interest in the partnership had a negative net value, and sought to recover $18,951.53 from

defendant. Prior to the filing of a responsive pleading by defendant, plaintiffs voluntarily dismissed their cause of action under the Orthopaedic Center Associates agreement, without prejudice.

On 20 December 2002, defendant filed an answer and counterclaims. Defendant asserted the following claims against Hickory Orthopaedic: (1) breach of contract for refusal to pay severance pay to defendant; and (2) breach of contract for refusal to pay the amount required by the agreement for defendant's stock in Hickory Orthopaedic. As to the Orthopaedic Center Associates agreement, defendant asserted claims for: (1) breach of the agreement, (2) fraud, and (3) unfair and deceptive trade practices against the partnership and the individual partners. Defendant also asserted a claim against Hickory Orthopaedic and its individual shareholders for conversion of defendant's personal property.

This matter was tried before Judge Cayer, sitting without a jury, on 10 May 2004. Partial judgment was entered on 16 July 2004, awarding defendant $71,179.44 plus interest for his claim for severance pay, and $675,545.36 plus interest as the value of defendant's stock in Hickory Orthopaedic. The trial court further ordered that the parties specifically perform the provisions of the Orthopaedic Center Associates partnership agreement and determine the value of defendant's interest. The court retained jurisdiction of the matter for resolution of the partnership matters, and for setting the amount of prejudgment interest on the judgments entered in favor of defendant. Defendant's claims for unfair and deceptive trade practices and for conversion were dismissed with prejudice.

A final judgment was entered on 11 February 2005. The trial court found the value of defendant's interest on Orthopaedic Center Associates partnership was $83,790.92 and awarded prejudgment interest on that amount of $12,469.93. The trial court awarded prejudgment interest on defendant's severance pay claim of $10,796.65 and on defendant's claim for the value of his stock of $100,684.78. From this final judgment, plaintiffs appeal.

Since this case was tried before a judge sitting without a jury, "this Court is bound by the trial court's findings which are supported by competent evidence, even if evidence exists to sustain contrary findings. Our review of the trial court's conclusions of law is *de novo*." *Johnson v. Bd. of Trs. of Durham Tech. Cmty. College*, 157 N.C. App. 38, 46-47, 577 S.E.2d 670, 675 (2003).

**[1]** In Hickory Orthopaedic's first argument, it contends that the trial court erred in determining the value of defendant's stock under the provisions of the Stock Agreement. We agree in part.

Hickory Orthopaedic first argues that the amount determined by the court to be the value of defendant's stock ($676,545.36) is grossly disproportionate to the purchase price in 1992 of $1,000.00, and that Hickory Orthopaedic's valuation of $8,030.14 is more reasonable. In this case, the formula for the valuation of the stock was agreed upon by the parties, and the courts are bound to follow the agreement of the parties, whether the value appears to be high or low compared to the original purchase price. *See Lagies v. Myers*, 142 N.C. App. 239, 247, 542 S.E.2d 336, 342 (2001).

**[2]** Hickory Orthopaedic next argues that the trial court failed to consider the parties' prior conduct in determining the value of defendant's stock under the terms of the Stock Agreement. It contends that prior purchases of stock by Hickory Orthopaedic under the agreement establish that its method of computation was correct.

Paragraph 3 of the Stock Agreement sets forth the formula for computing the purchase price of stock in the corporation:

That the purchase price of the stock of any Stockholder for any stock of the Corporation now owned or hereafter governed by this Agreement shall be the pro rata value of the share or shares of stock of the Stockholder whose interest is being purchased, to the total book value of all of the issued and outstanding shares of stock of the Corporation as is determined by the regularly retained Certified Public Accountant of the Corporation.

Paragraph 19 of the Stock Agreement contains "Definitions of Terms," which includes the following:

2. Book Value. An accounting term which shall be seemed to mean substantially the following. Book value is the result of applying the cost and matching principals (with certain exceptions); generally it is acquisition costs, less accumulated write-offs to date. Cash is reported at its current value, accounts receivable at expected net realizable value- (amount of the receivables less the allowance for doubtful accounts), inventories and marketable equity securities usually are reported at lower of cost or market, and plant and equipment are reported at cost, less accumulated depreciation.

Also, as applied to stocks, the proportionate amount of money that would accrue to each share of outstanding capital stock of the Corporation if all the Corporation's assets were converted into cash at the values appearing on the books, and all of its creditors and other prior claimants, if any, were paid in full.

That for the purpose of this Agreement, book value shall be deemed to mean that value applied pursuant to the generally accepted accounting procedures, by the regularly retained Certified Public Accountant for the Professional Association.

3. Net Book Value. As used herein, Net Book Value shall be used interchangeably with Book Value and shall mean, total fixed assets, less accumulated depreciation (net fixed assets) less liabilities, and have the same meaning as Book Value.

Much of the confusion that exists in this case pertains to the use of the terms "total book value," "book value" and "net book value" in the agreement. Plaintiff argues that there are multiple ambiguities and contradictions in these terms, asserting that "total book value" is nowhere defined in the agreement, and that the definitions of "book value" and "net book value" are inherently contradictory, even though the agreement states that they "shall have the same meaning."

The trial court made the following conclusion of law:

The language of Section 3 of the Stock Agreement, concerning the "total book value as is determined by the regularly retained Certified Public Accountant of the Corporation" simply provides for the accountant to calculate "total book value" as defined in Paragraph 2 of Section 19 of the Stock Agreement.

We review this conclusion de novo. Johnson, 157 N.C. App. at 46-47, 577 S.E.2d at 675. Taken in the context of the entire agreement, the phrase "total book value" as set forth in section 3 is not a term of art, meant to be different from the term "book value." The term "total" simply refers to the book value of all outstanding shares, which is then to be used to compute the value of defendant's shares by applying the percentage that defendant's shares bear to all outstanding shares of the corporation to determine their value.

There is a conflict between the terms "book value" and "net book value" as found in section 19 of the agreement. It is clear from both definitions that the computation of book value would include a reduction in the value of assets for liabilities, accumulated depreciation,

and doubtful accounts. The definitions differ in whether book value is computed based upon the fixed assets of the corporation only, or whether intangible assets such as accounts receivable, marketable securities and cash, plus inventory, are to be considered in the computation. This is the critical distinction in this case. The trial court included the intangible assets and inventory as part of its computation. Hickory Orthopaedic contends that this was improper, and excluded these items in reaching its much lower valuation.

In construing these provisions we must look to the intent of the parties, and consider the provisions within the context of the entire agreement. *State v. Philip Morris USA Inc.*, 359 N.C. 763, 778, 618 S.E.2d 219, 228 (2005). The computation of the value of the stock is expressly based upon "book value" not "net book value." We hold that the term "net book value" was included in the agreement only to emphasize that debts and depreciation (which are already expressly excluded in "book value") were to be deducted in the computation of book value. It was not the intent of the parties to limit the computation of book value to fixed assets. We further note that the second paragraph of the definition of "book value" expressly refers to the valuation of the "stock of the Corporation." The term "Corporation" refers to Hickory Orthopaedic by the terms of the agreement. The trial court correctly determined that the intangible assets and inventory were to be considered in the computation.

[3] Hickory Orthopaedic argues that because the definitions of "book value" and "net book value" are inconsistent, this renders the terms of the agreement ambiguous, and the trial court erred in failing to consider prior dealings of the parties when interpreting the contract. Hickory Orthopaedic cites *Patterson v. Taylor*, 140 N.C. App. 91, 97, 535 S.E.2d 374, 378 (2000), for the proposition that the court should look to the prior conduct of the parties when faced with a contract ambiguity. Patterson holds:

In contract law, where the language presents a question of doubtful meaning and the parties to a contract have, practically or otherwise, interpreted the contract, the courts will ordinarily adopt the construction the parties have given the contract *ante litem motam*." However, even where a trial court concludes that extrinsic evidence of the parties' behavior implementing the agreement is probative of the parties' intent at the time of the execution of the agreement, the court is not free to consider such evidence to the exclusion of other probative and admissible evidence of the

parties' intent when the agreement was executed. In other words, if a trial court considers extrinsic evidence pertaining to interpretation of an ambiguous term, it must consider all relevant and material evidence. It is then the responsibility of the trial court to determine the weight and credibility of that evidence.

*Id.* The language of the agreement is not ambiguous with respect to the proper method of valuation for the corporation's stock. The trial court did not err to the extent it failed to consider prior course of conduct in interpreting the intent of the parties for this issue.

We further note that Hickory Orthopaedic cites to only one prior stock purchase in its argument, that of Dr. Stanley Peters upon his death. Prior course of conduct evidence is more compelling when the prior conduct involved the same parties in the same relation to each other. That is not the case here. Dr. Peter's estate did not contest the valuation of Dr. Peters' shares, and accepted the amount offered by Hickory Orthopaedic. We do not find this one instance of prior conduct to be compelling when considered in light of the express language of the agreement and all other relevant material evidence. *Id.*

Hickory Orthopaedic argues that the trial court further erred by failing to make findings of fact concerning this prior conduct. First, Hickory Orthopaedic fails to cite any authority in support of this proposition, which is a violation of N.C. R. App. P. Rule 28(b)(6), and subjects this argument to dismissal. *Atchley Grading Co. v. W. Cabarrus Church,* 148 N.C. App. 211, 212-13; 557 S.E.2d 188, 189 (2001); *Wilson v. Wilson,* 134 N.C. App. 642, 643, 518 S.E.2d 255, 256 (1999). Second, "[t]he trial court need not recite in its order every evidentiary fact presented at hearing, but only must make specific findings on the ultimate facts established by the evidence, admissions, and stipulations that are determinative of the questions raised in the action and essential to support the conclusions of law reached." *Mitchell v. Lowery,* 90 N.C. App. 177, 184, 368 S.E.2d 7, 11 (1988); *see also Guilford County Planning & Dev. Dep't v. Simmons,* 102 N.C. App. 325, 326, 401 S.E.2d 659, 660 (1991). We hold that the trial court was not required to make specific findings of fact on this matter.

[4] Hickory Orthopaedic next argues that the trial court erred in ignoring the express language of sections 3 and 19 of the agreement which require that the computation of the value of defendant's stock be computed by "the regularly retained Certified Public Accountant of the Corporation." The issue presented is whether the computation by the corporation's accountant would control over the formula set

forth in the agreement. Since this involves a question of contract interpretation, we review this issue *de novo*. *Alchemy Communs. Corp. v. Preston Dev. Co.*, 148 N.C. App. 219, 222, 558 S.E.2d 231, 233 (2002).

Clearly, the purpose of the provision requiring computation by Hickory Orthopaedic's regular CPA was to have a person familiar with Hickory Orthopaedic's business and accounting practices make the computation. However, paragraph 19-2 of the agreement clearly sets forth the formula for the computation. There is nothing in the agreement that remotely suggests that in making the computation that the regular CPA would be authorized to disregard these provisions. The trial court properly found that the CPA was required to compute the value of the stock in accordance with the terms of the agreement.

Further, the record indicates that when this dispute first arose, Hickory Orthopaedic did not request that its regular CPA perform the computation of the value of defendant's stock. Rather, the computation was performed by Dr. Winfield, one of the shareholders of Hickory Orthopaedic. Dr. Winfield computed the value of the stock based solely upon the fixed assets of Hickory Orthopaedic, and did not consider any intangible assets or inventory, arriving at a value of $8,030.14. John Holland, the regular CPA of Hickory Orthopaedic testified at trial, but did not express an opinion of the value of defendant's stock. Since Hickory Orthopaedic chose not to comply with the provisions of the agreement requiring their CPA to make the computation, and offered no evidence at trial that the CPA performed the computation, they cannot now on appeal complain that the trial court did not require that the computation be performed by its CPA.

[5] Finally, Hickory Orthopaedic argues that the computation of the value of defendant's stock by defendant's CPA, William Lawing, which was adopted by the trial court, was incorrect and does not support the trial court's award. Specifically, Hickory Orthopaedic contends that Lawing acknowledged that he estimated the value of inventory based upon information provided by defendant; and that he did not indicate in his testimony that he had reduced accounts receivable to their "net realizable value" as mandated in the stock agreement.

The stock agreement provides that "inventories . . . usually are reported at lower of cost or market, and plant and equipment are reported at cost, less accumulated depreciation," and that accounts receivable are reported "at expected net realizable value- (amount of the receivables less the allowance for doubtful accounts)." The trial

court did not include any findings of fact indicating how it valued these assets. It appears that the trial court adopted Lawing's calculations. Lawing testified that his calculation of inventories was simply an estimate based upon information provided by defendant. Lawing gave no testimony indicating how he calculated accounts receivable for the purposes of the stock agreement, and there is no indication that he calculated them at their expected net realizable value. Lawing was asked this question at trial: "So your role in this case is not to give an expert opinion but instead simply to provide calculations based upon a set of assumptions?" to which he answered: "Basically, yes, I'd say that's right."

We note that both parties have filed claims in which they argue that the opposing party is incorrectly valuing defendant's stock. For this reason, neither party bears the burden of proof on this issue. It is the duty of the trial court to hear the evidence presented by both parties, and make its determination.

We hold that the trial court's findings of fact on this matter are insufficient for this Court to review the trial court's valuation of defendant's stock, and do not support its conclusion of law that the value of defendant's stock as of 30 June 2002 was $676,545.36. We vacate that portion of the trial court's judgment, and remand this matter to the trial court with instructions to enter findings of fact demonstrating the valuation of defendant's stock is based upon the definition of "Book Value" as defined in section 19, paragraph 2 of the stock agreement, or otherwise take action consistent with this opinion. On remand, the trial court may, in its discretion, hear additional evidence on this issue. *Woodring v. Woodring*, 164 N.C. App. 588, 592, 596 S.E.2d 370, 373 (2004). The findings of fact should be sufficiently detailed to allow appellate review of the calculation of all assets used in reaching the trial court's award. Accounts receivable should be calculated at expected net realizable value as mandated by the stock agreement, and there shall be sufficient findings to support the inventories calculation.

[6] In Hickory Orthopaedic's third argument, it contends that the trial court erred in finding that defendant was terminated due to permanent disability, because there was no competent evidence that plaintiff knew defendant was permanently disabled at the time of termination. We disagree.

Hickory Orthopaedic cites no authority for any of the legal arguments they make concerning this issue. In fact, there is not a single

case or statute cited in this argument. It is not the duty of this Court to find authority in support of plaintiffs arguments on appeal. "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned." N.C. R. App. P., Rule 28(b)(6) (2004); *see also Wilson v. Wilson*, 134 N.C. App. 642, 643, 518 S.E.2d 255, 256 (1999).

Even assuming *arguendo* that Hickory Orthopaedic has properly preserved this argument, we hold that there is competent evidence in the record supporting the trial court's findings of fact and conclusions of law that defendant was terminated based upon permanent disability. When the trial court sits without a jury, its findings of fact are "conclusive if supported by competent evidence, irrespective of evidence to the contrary." *Nutek Custom Hosiery, Inc. v. Roebuck*, 161 N.C. App. 166, 168, 587 S.E.2d 502, 504 (2003).

In the instant case, the trial court made findings of fact that defendant "exhibited aberrant behaviors" during his tenure with Hickory Orthopaedic, including "angry outbursts and temper tantrums"; that the stockholders of Hickory Orthopaedic met with defendant and presented their concerns, including concern for his "personal well-being and the health and safety of (his) patients"; that defendant agreed to seek counseling; that defendant was evaluated by professionals at Risk Treatment Services, who reported his "behaviors are likely to continue and worsen in the workplace without substantial intervention," and that they suspected defendant suffered from a personality disorder; that defendant's psychotherapist, Dr. Ahsanuddin, diagnosed defendant with chronic major depression mixed with anxiety; that Dr. Ahsanuddin signed an Attending Physician's Statement "supporting a disability claim Dr. Nicks filed with UNUM insurance" in which Dr. Ahsanuddin "wrote that Dr. Nicks was 'unable to practice his speciality' and that it was 'undetermined' when he could return to work," and that this clinical depression began approximately January of 2002; that Dr. Ahsanuddin's prognosis was that defendant was "totally disabled"; that Dr. Ahsanuddin wrote a letter to Hickory Orthopaedic on 11 June 2002 in which he informed the shareholders that defendant had been suffering from undiagnosed depression, which had become chronic, and which rendered him unable to "continue a busy practice as a physician"; that defendant began treatment with Dr. Yeomans, a psychiatrist, who testified at trial that defendant was "markedly depressed with psychomotor retardation," that defendant suffered from severe major depressive disorder, and possibly post-traumatic stress disor-

der; that Dr. Yeomans recommended defendant not return to work and prescribed anti-depressant medication and continued psycho-therapy; that Dr. Yeomans testified that in his opinion defendant was permanently disabled when he was terminated 1 July 2002; that defendant's former legal counsel, Spencer Aldridge, wrote Hickory Orthopaedic on 5 April 2002 stating that defendant could not perform his duties due to illness, and that "it was uncertain how long Dr. Nicks would be disabled"; and that Mr. Aldridge wrote counsel for Hickory Orthopaedic on 28 June 2002 informing Hickory Orthopaedic that defendant was "disabled (and) will continue to be disabled, due to clinical depression, for at least some period of time."

We hold that there is competent evidence in the record to support the trial court's findings that defendant was disabled at the time he was terminated, and that these findings in turn support the trial court's conclusion that defendant was terminated due to a disability. This argument is without merit.

**[7]** In Hickory Orthopaedic's second argument it contends in part that the trial court erred in entering judgment which made the purchase of defendant's stock by Hickory Orthopaedic mandatory. We disagree.

Hickory Orthopaedic contends that because defendant was terminated, the provisions of section 6 of the stock agreement control, and Hickory Orthopaedic has the option to repurchase defendant's shares, but is not required to do so. Section 6 of the stock agreement states that "upon termination of employment of any Stockholder . . . by the Corporation, the Corporation shall have the option to purchase . . . upon demand any and all outstanding stock . . . from the Stockholder . . . ." Section 5 of that same agreement states: "The Corporation, upon the . . . disability . . . of a Stockholder, *shall* purchase from the Stockholder . . . any and all stock of the Corporation owned by the . . . disabled Stockholder . . . ." (Emphasis added).

As discussed above, we have affirmed the ruling of the trial court that defendant was terminated as a result of his disability. Even if this were not so, our decision on this issue would remain the same. Under paragraph 6, Hickory Orthopaedic had the *option* to purchase defendant's stock. By filing the complaint in this action seeking court order to compel defendant to sell his stock, Hickory Orthopaedic exercised this option.

The argument of Hickory Orthopaedic in essence is that since it does not agree with the trial court's valuation of the stock

($676,545.36 as opposed to its valuation of $8,030.14) that they should have the option to refuse to purchase the stock at the higher valuation. By instituting this lawsuit, Hickory Orthopaedic exercised its option, and submitted the issue of valuation to the court for resolution. This argument is without merit.

[8] In Hickory Orthopaedic's fourth argument, it contends that the trial court erred in awarding severance pay to defendant, and erred in accepting the calculation of severance pay done by defendant's accountant. We disagree.

The Stock Agreement provides for severance pay in the event of the permanent disability of any stockholder. The agreement further states: "That if a Stockholder becomes an ex-stockholder due to any permanent physical or mental disability, then the Stockholder shall receive one hundred (100) percent of the basic Severance Pay." Nowhere in the agreement does it state that termination of a stockholder *because of disability* negates his right to severance pay. As set forth above, the trial court made findings of fact and conclusions of law to the effect that defendant, a stockholder, became an ex-stockholder by termination based upon permanent disability, and we have affirmed these rulings. We hold that the plain language of the stock agreement relevant to severance pay applies to stockholders terminated due to permanent disability.

[9] Hickory Orthopaedic further contends that the trial court erred by accepting the calculation of severance pay made by defendant's accountant, instead of any calculation made by the corporation's regularly retained accountant. Though Hickory Orthopaedic contends that defendant's accountant erred in the method he used to calculate the severance pay due, it does not explicitly argue that the final amount reached by defendant's accountant was incorrect. Further, Hickory Orthopaedic makes no argument that the corporation's regularly retained accountant would have calculated a lower amount. Finally, nowhere in the agreement does it state that severance pay must be calculated by the corporation's regularly retained accountant. Therefore, in Hickory Orthopaedic's argument of this issue, there is no showing of either error or prejudice. This argument is without merit.

[10] In Hickory Orthopaedic's seventh argument, it contends that the trial court erred in entering judgment against any plaintiffs other than Hickory Orthopaedic because there were no other plaintiffs in the case when defendant served his counterclaims. We agree.

Plaintiffs originally filed their complaint on 25 October 2002 asserting two causes of action: (1) breach of the stock agreement, and (2) breach of the partnership agreement. The claims under the stock agreement, which we have addressed above, only involved Hickory Orthopaedic and defendant as parties. The individual plaintiffs were not personally obligated to defendant under the terms of the stock agreement.

Plaintiffs voluntarily dismissed their second cause of action, brought under the partnership agreement, on 10 December 2002. The individual plaintiffs and The Orthopaedic Center Associates partnership were only parties to the action based upon this second cause of action. Defendant filed his answer and counterclaims in this action on 20 December 2002, after plaintiffs had voluntarily dismissed their second cause of action. Therefore, at that time Hickory Orthopaedic was the sole remaining plaintiff in the action. Defendant did not include Hickory Orthopaedic as a party in his counterclaims under the partnership agreement, and our review of the partnership agreement reveals that Hickory Orthopaedic was not a party to that agreement. There is no indication in the record that defendant moved to amend the pleadings to include the individual plaintiffs or Orthopaedic Center Associates as parties to the action pursuant to the North Carolina Rules of Civil Procedure, nor any indication that they were in fact made parties to this action. In short, once plaintiffs voluntarily dismissed their second cause of action, the individual plaintiffs and Orthopaedic Center Associates were no longer parties to the action. Because they were not brought back into the action by defendant, they are not now parties to this action. Since the individual plaintiffs and Orthopaedic Center Associates are not parties to this action, the trial court never obtained jurisdiction over them and had no authority to enter judgment against them. All judgments against any individual plaintiff or Orthopaedic Center Associates must therefore be vacated. See Polygenex Int'l, Inc. v. Polyzen, Inc., 133 N.C. App. 245, 247-48, 515 S.E.2d 457, 459-60 (1999). Further, as Hickory Orthopaedic was not a party to the partnership agreement, and had no obligation to defendant under that agreement, no judgment entered under the partnership agreement may be enforced against Hickory Orthopaedic. Therefore the trial court erred in entering judgment based on the stock agreement against Hickory Orthopaedic and the individual plaintiffs jointly and severally. We vacate that portion of the judgment holding the individual plaintiffs liable for claims brought under the stock agreement.

In light of our holdings above, we do not address plaintiff's other arguments.

We further note that defendant also appealed the judgment in this action, but he has not argued any of his assignments of error on appeal, and they are deemed abandoned. N.C. R. App. P. Rule 28(b)(6) (2004).

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

Judges WYNN and SMITH concur.