Classic Coffee Concepts, Inc. v. Anderson, 2008 NCBC 1

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 2941

CLASSIC COFFEE CONCEPTS, INC.,

Plaintiff,

v.

J. MICHAEL ANDERSON,

Defendant.

**ORDER & JUDGMENT**

*Mayer Brown LLP by Eric H. Cottrell for Plaintiff Classic Coffee Concepts, Inc.*

*McNaughton & Shelton, PLLC by Edward J. McNaughton and Gregory L. Shelton for Defendant J. Michael Anderson.*

Diaz, Judge.

{1}     The Court called this matter for trial on 1 October 2007.  The parties waived their right to a jury trial.

{2}     After considering the opening statements of the parties, the testimony of the witnesses, the exhibits presented and admitted at trial,[1] and the closing arguments of the parties, the Court enters the following Order and Judgment.

I.

PROCEDURAL HISTORY

{3}     Plaintiff Classic Coffee Concepts, Inc. ("Classic Coffee" or the "Company") filed its Complaint in Mecklenburg County Superior Court on 13 February 2006.

{4}     On 24 April 2006, Defendant J. Michael Anderson ("Anderson") answered the Complaint and also asserted counterclaims (the "Counterclaims") for Breach of

---

[1] To the extent not ruled on at trial, all objections to the introduction and use of Joint Exhibits 1–89 are **OVERRULED**.  In particular, Anderson having withdrawn his objection to Joint Exhibit 33 following the close of his evidence, the Court considered this exhibit.

Contract (as to a Stockholders Agreement), Unconscionability, Breach of Employment Contract, and Judicial Dissolution.

{5}     The case was subsequently transferred to the North Carolina Business Court and assigned to me as a mandatory complex business case.

{6}     On 22 June 2006, Classic Coffee moved to dismiss Anderson's Counterclaims for Unconscionability and Judicial Dissolution.  The Court granted Plaintiff's motion by Order dated 1 December 2006.

{7}     On 24 April 2007, Classic Coffee dismissed its Complaint with prejudice.

{8}     On 22 May 2007, the Court granted Classic Coffee's Motion to Amend its Notice of Dismissal to reflect that such dismissal was without prejudice.

{9}     Prior to trial, Anderson dismissed his Counterclaim alleging breach of the Employment Agreement, leaving only his claim alleging breach of the Stockholders Agreement for trial.

{10}   As to that claim, Anderson stipulated at trial that he was only pursuing relief for two specific breaches:  (1) Classic Coffee's alleged failure to properly value his stock, and (2) Classic Coffee's alleged failure to redeem his stock within sixty days of the effective date of Anderson's termination as a Classic Coffee employee.


II.

FINDINGS OF FACT[2]

A.

THE PARTIES

{11}   Classic Coffee is a closely-held Delaware corporation with its principal place of business in Mecklenburg County, North Carolina.  (Joint Exs. 1, 33.)

{12}   Anderson is a citizen and resident of Statesville, North Carolina.

{13}   From 1993 to 22 July 2003, Anderson was employed by Classic Coffee, first as its Controller, and eventually as its Chief Financial Officer.  (Joint Ex. 15.)

---

[2] Where appropriate, the Court has identified the joint exhibit supporting a particular finding of fact. Many of the Court's findings, however, come from the testimony presented at trial.  Because no final transcript has been prepared, the Court's order does not refer to a record citation for such facts.

{14}   Anderson also served as a director of Classic Coffee.

{15}   Anderson owns 15,000 of Classic Coffee's 45,000 issued and outstanding shares of common stock.[3]  (Joint Ex. 2.)

B.

THE DISPUTE

{16}   On 5 December 2000, Anderson and Classic Coffee entered into a Stockholders Agreement.  (Joint Ex. 1.)

{17}   On or about that same date, Anderson entered into a Pledge Agreement and a separate Continuing and Unconditional Guaranty Agreement ("Guaranty Agreement") with Bank of America, N.A. (the "Bank").  (Joint Exs. 3, 10.)

{18}   On 22 July 2003, Anderson's employment with Classic Coffee was terminated "without cause," effective 1 August 2003.  (Joint Exs. 13, 15.)

{19}   The Stockholders Agreement requires Classic Coffee to purchase, and the stockholder whose employment is terminated without cause to sell, all of the Company's stock held by such stockholder.  (Joint Ex. 1 ¶ 3.1(b).)

{20}   The Stockholders Agreement also provides that the "price per share at which the Stock of a Stockholder shall be purchased and sold . . . shall be equal to the quotient of the 'fair market value' of [Classic Coffee] . . . divided by the total number of shares . . . issued and outstanding."  (Joint Ex. 1 ¶ 3.2(a).)

{21}   The Stockholders Agreement defines Classic Coffee's "fair market value" as the difference between the fair market value of the Company's capital stock determined by the independent appraisal of the Employee Stock Ownership Plan and Trust ("ESOP") "for the most recent valuation that precedes the date of the Stockholders termination of employment" and the liquidation preference of any preferred stock of the Company issued and outstanding as of the date of termination."  (Joint Ex. 1 ¶ 3.2(b).)[4]

---

[3] Anderson was unclear about what he paid for his shares, at one point testifying that it may have been a total of $150.00, then later stating that it may have been only $1.00.

[4] The Company never issued preferred stock.

{22}   The Stockholders Agreement allows Classic Coffee to pay a stockholder for his shares by equal installments on a sixty-month promissory note.  (Joint Ex. 1 ¶ 3.3(b).)

{23}   As to stockholder employees who are terminated "without cause," the Stockholders Agreement requires that the "fair market value" of the employee's shares be re-calculated on the anniversary date of the stockholder's termination until the stockholder is paid in full, and that any increase in the value of the stock be added to the balance of the promissory note.  (Joint Ex. 1 ¶ 3.3(b).)

{24}   Under paragraph 3.4 of the Stockholders Agreement, "[t]he closing of any purchase and sale [of stock] . . . shall be consummated . . . within sixty (60) days following . . . the termination of the Stockholder's employment with [Classic Coffee]."  (Joint Ex. 1 ¶ 3.4.)

{25}   Classic Coffee never established an ESOP.

{26}   Pursuant to the Pledge Agreement, Anderson's stock was assigned to the Bank as collateral for his personal guarantee of Classic Coffee's loan agreements with the Bank.  (Joint Ex. 3.)

{27}   The termination of Anderson's employment with Classic Coffee did not discharge his obligations under the Guaranty Agreement.  (Joint Ex. 10 ¶ 7.)

{28}   The Stockholders Agreement addresses the question of pledged stock in the context of a mandatory redemption following termination of an employee:

> If one of the events described in Article . . . III of this Agreement occurs prior to the time that all of a Stockholder's Stock is released from the Stock Pledge, the Company, if otherwise permitted under the terms of the Stock Pledge, . . . **shall** exercise its rights pursuant to Article III to purchase said pledged Stock.  In such event, the total purchase price for the Stock shall be determined in accordance with this Agreement and the Company shall be entitled to a dollar-for-dollar credit against the purchase price to be paid to such Stockholder for the Stock for any amounts paid to the Bank to retire the obligation of the Stockholder to the Bank or to otherwise obtain the release of the pledged Stock from the Stock Pledge.

(Joint Ex. 1 ¶ 1.2(b) (emphasis added).)

{29}   Following the termination of Anderson's employment, Classic Coffee asked the Bank to release Anderson's stock.  (Joint Exs. 58, 64.)  However, Classic Coffee owed a substantial amount of money to the Bank at that time, and the Bank refused to release the stock.  (Joint Ex. 58.)

{30}   Classic Coffee made no monetary offer to the Bank to release Anderson's stock.

{31}   Classic Coffee did not redeem Anderson's stock within sixty days of the effective date of his termination.

{32}   Anderson made numerous demands for redemption of his shares following his termination.  (Joint Exs. 53–54, 56–57, 59.)

{33}   On each occasion, Classic Coffee responded either (1) that it could not redeem Anderson's shares while they were pledged to the Bank, or (2) that it was conducting a valuation to determine the price it would pay for Anderson's shares.  (Joint Exs. 53, 55–56, 58.)

{34}   Several months before Anderson was terminated, Classic Coffee's outside accountants (Cherry Bekaert Holland, hereinafter "CBH") prepared a draft appraisal of the Company for purposes of conducting a goodwill impairment analysis.[5]  (Joint Ex. 31.)

{35}   CBH's draft appraisal (prepared on 7 February 2003) set the Company's fair value at $12,500,000.00, on a controlling interest basis.[6]  (Joint Ex. 31.)

{36}   The information used by CBH to prepare the draft appraisal consisted of sales projections prepared by Anderson, with input from other Classic Coffee employees.  (Joint Ex. 26.)

{37}   The sales projections provided to CBH included markedly more aggressive sales numbers (the so-called "bright" plan) than those provided by the Company to its lenders (the so-called "bank" plan).  (Joint Ex. 87.)

---

[5] "Goodwill impairment" is an accounting standard requiring that the recorded value of a company's goodwill be equal to or greater than its fair value.  If it is not, goodwill is said to be impaired, requiring a write-off to its present fair value.

[6] Applying that value, Anderson's 15,000 shares would be worth over $4 million.

{38}   The "bright" plan was created for internal planning purposes and was never intended to be disseminated outside of the Company.

{39}   Had CBH known about the two sets of conflicting sales projections, it would have "thought long and hard" about conducting an appraisal without addressing this discrepancy.

{40}   The CBH draft appraisal valued Classic Coffee at its fair value, not fair market value.

{41}   An appraisal based on "fair value" does not account for certain discounts in value that are typical for closely-held companies, including lack of marketability of the stock, discounts for minority interests, and "keyman" discounts.

{42}   CBH used its draft appraisal to support its goodwill impairment analysis, and accounting conventions limit its use to that purpose.

{43}   Because CBH was using the appraisal for a limited purpose, it did not issue it in final form.

{44}   Standard accounting conventions make it inappropriate to use the 7 February 2003 draft appraisal to value the Company's stock as if an ESOP had been in place.

{45}   Anderson also asked CBH to prepare a second appraisal in conjunction with potential merger talks with an outside entity.  (Joint Ex. 32.)

{46}   For purposes of this appraisal, CBH was asked to determine the Company's fair market value as of 31 December 2002.  (Joint Ex. 32.)

{47}   CBH took its February 2003 valuation of "fair value" and factored in discounts applicable to a closely-held corporation to arrive at a fair market value for the Company (on a controlling interest basis) of $8,390,000.00.[7]  (Joint Ex. 32.)

{48}   CBH submitted its second appraisal (in draft form) to Anderson on or about 18 March 2003.  (Joint Ex. 32.)

{49}   CBH advised Anderson that its appraisal was valid only for the specific purpose for which it was prepared.  (Joint Ex. 32.)

---

[7] Applying that value, Anderson's 15,000 shares would be worth over $2.7 million.

{50} An ESOP fair market value appraisal is markedly different than a conventional fair market value appraisal.[8]

{51} ESOP regulations require appraisals to be "full appraisals" and neither one of CBH's draft appraisals were full appraisals.

{52} Pursuant to standard accounting conventions, it is inappropriate to use CBH's second draft appraisal to value the Company's stock as if an ESOP had been in place.

{53} Anderson did not share the CBH draft appraisals with the other members of the Company's board of directors.

{54} On or about 3 November 2003, Classic Coffee retained Marshall & Stevens ("M&S") to perform a valuation as if an ESOP were in place for the purpose of determining Classic Coffee's fair market value and, in turn, the value of Anderson's stock. (Joint Ex. 33.)

{55} According to the M&S report, as of 31 December 2002 (approximately one year before Anderson was terminated), "the fair market value of 100% of the equity in Classic Coffee Concepts, Inc., on a non-marketable, minority interest basis [was $360,000.00]." (Joint. Ex. 33).

{56} In turn, the fair market value of one share of the Company's stock (based on 45,000 outstanding shares) was $8.00, thus setting a value of $120,000.00 for Anderson's 15,000 shares. (Joint Ex. 33.)

{57} Classic Coffee notified Anderson of this valuation on or about 19 February 2004, but did not tender this amount to Anderson because the Bank had not yet released Anderson's shares from the stock pledge. (Joint Ex. 81.)

---

[8] One distinguishing factor (although not the only one) is how the existence of an ESOP affects the "marketability" discount used by a valuation professional. Such a discount reflects the financial reality that shares of small closely-held corporations do not trade frequently and therefore are generally less attractive than similar publicly held stocks for which there is a ready market. *Okerlund v. United States,* 365 F.3d 1044, 1050 (Fed. Cir. 2004). A typical ESOP, however, obligates an employer to purchase a departing employee's stock, thus establishing a potential market for the stock. As a result, while a marketability discount still applies to ESOP shares in a closely-held corporation, it is typically less than would be applied otherwise. (Joint Ex. 33.)

{58}　On or about 3 May 2005, Classic Coffee engaged M&S to perform another fair market value appraisal for the purpose of valuing Anderson's stock as of 31 December 2004, in the context of a hypothetical ESOP. (Joint Ex. 34.)

{59}　The second M&S appraisal placed the fair market value of Anderson's stock at $192,000.00. (Joint Ex. 34.)

{60}　In or around November 2005, Classic Coffee began negotiating a refinancing of its credit facility with the Bank. In connection with those negotiations, Classic Coffee again requested that the Bank release Anderson's shares.

{61}　This time, the Bank agreed to release Anderson's shares.

{62}　On 14 December 2005, Classic Coffee informed Anderson that it would "proceed with the mandatory redemption of [Anderson's] stock as required by the Stockholders Agreement." (Joint Ex. 83.)

{63}　Classic Coffee's letter, which was enclosed with copies of documents setting forth the terms and conditions of the proposed transaction, set a purchase price of $192,000.00 and a closing date of 30 December 2005. (Joint Ex. 83.)

{64}　Anderson refused to tender his stock to Classic Coffee.

{65}　On 6 March 2007, M&S modified its 31 December 2004 appraisal. (Joint Ex. 85.) In arriving at its $192,000.00 value for Anderson's shares, M&S failed to consider the effect of an agreement between Classic Coffee and another company on Plaintiff's equity value.

{66}　Accounting for this agreement should have resulted in the value of the equity of Classic Coffee being zero as of 31 December 2004, except for some nominal speculative value. (Joint Ex. 85.)

{67}　Thus, the value of Anderson's stock as of 31 December 2004, based on the M&S modified appraisal, was at or near zero. (Joint Ex. 85.)

III.

CONCLUSIONS OF LAW

{68} This Court has subject matter jurisdiction over this dispute and personal jurisdiction over the parties.

{69} Venue is proper because Plaintiff's principal place of business is in Mecklenburg County and the events giving rise to this action occurred, in whole or in part, in Mecklenburg County.

{70} Venue is also proper because the 5 December 2000 Stockholders Agreement that is the subject of this action provides that all litigation relating to it shall be brought and maintained exclusively in the courts of Mecklenburg County, North Carolina. (Joint. Ex. 1, ¶ 5.8.)

{71} Classic Coffee stipulated at trial that it breached the Stockholders Agreement by failing to perform valuations of Anderson's shares annually.

{72} Anderson also claims that Classic Coffee breached the Stockholders Agreement by failing to purchase his shares within sixty days of his termination.

{73} Classic Coffee contends it did not breach this provision of the Stockholders Agreement because Anderson's shares were at all relevant times pledged to the Bank as collateral, and therefore Anderson was in no position to tender them for redemption.

{74} The Court, however, concludes that the Bank's release of Anderson's shares was not a condition precedent to Classic Coffee's obligation to redeem them.

{75} To the contrary, the Stockholders Agreement required Classic Coffee to (if necessary) purchase Anderson's shares from the Bank and credit the purchase price to the net amount due Anderson for the redemption.

{76} Alternatively, nothing on the face of the Stockholders Agreement prevented Classic Coffee from redeeming the shares in exchange for Anderson relinquishing any and all rights to those shares upon their release by the Bank.

{77} Classic Coffee never did anything more than request that the Bank release Anderson's shares.

{78}   Accordingly, the Court concludes that Classic Coffee breached the terms of the Stockholders Agreement by failing to redeem the shares within sixty days of Anderson's effective date of termination.

{79}   The Court concludes further that Classic Coffee's over two-year delay in tendering performance amounted to a material breach, and Anderson is therefore entitled to judgment in his favor.  *Cf. Avesair, Inc. v. Inphonic Inc.,* 2007 NCBC 32 ¶¶ 15, 27 (N.C. Super. Ct. Oct. 16, 2007), http://www.ncbusinesscourt.net/opinions/ 101607%20Order%20Webpage.pdf (applying Delaware law, which the court stated recognizes many of the same principles of contract construction as North Carolina, and concluding that a party materially breaches an agreement where he fails to perform within a reasonable time).

{80}   As to the form of the judgment, a person damaged by a breach of contract is entitled to be placed, insofar as this can be done by money, in the same position he would have occupied if there had been no breach.  *Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.*, 143 N.C. App. 1, 9, 545 S.E.2d 745, 750 (2001)  (*quoting Perfecting Serv. Co. v. Prod. Dev. & Sales Co.,* 259 N.C. 400, 415, 131 S.E.2d 9, 21 (1963)).

{81}   Here, this means Classic Coffee should have tendered payment for Anderson's shares within sixty days of the effective date of Anderson's termination as a Classic Coffee employee.

{82}   The principal dispute at trial, however, was the amount that Anderson should receive for those shares.

{83}   Anderson contends the price Classic Coffee offered him for his shares on 14 December 2005 was too low because the Company did not follow the terms of the Stockholders Agreement in calculating the share price.

{84}    The parties in this case attempted to fix on a valuation mechanism precisely to avoid this type of dispute.

{85}   To that end, the Stockholders Agreement provides that the price for an exiting shareholder's shares would be the "fair market value" of those shares as "determined by the independent appraisal obtained by the ESOP for the most

recent valuation that precedes the date of the Stockholder's termination of employment." (Joint Ex. 1 ¶ 3.2(b).)

{86}  North Carolina courts are bound to follow the agreement of the parties as to valuation of stock, "whether the value appears to be high or low compared to the original purchase price." *Hickory Orthopaedic Ctr., P.A., v. Nicks,* 179 N.C. App. 281, 287, 633 S.E.2d 831, 835 (2006) (citing *Lagies v. Myers*, 142 N.C. App. 239, 247, 542 S.E.2d 336, 342 (2001)).

{87}  The evidence at trial, however, showed that Classic Coffee never established an ESOP and therefore never timely determined the "fair market value" of Anderson's stock consistent with the Stockholders Agreement.

{88}  The Court has considered whether the failure to establish an ESOP amounted to a failure of a condition precedent excusing performance by both parties.  It has declined to so find in this case for the following reasons:  (1) conditions precedent are not favored by the law, *Craftique, Inc. v. Stevens & Co.,* 321 N.C. 564, 566, 364 S.E.2d 129, 131 (1988), and (2) neither party argued the point at trial, requesting instead that the Court fix the value of Anderson's shares on the evidence presented.

{89}  Accordingly, the Court proceeds to consider the evidence as to value.

{90}  Anderson argues that the two CBH draft appraisals are the most reliable evidence of value because they rely on management's contemporaneous sales projections.   In support of that proposition, Anderson points me to the Delaware Court of Chancery's opinion in *Prescott Group Small Cap, L.P., v. Coleman Co.,* No. 17802, 2004 Del. Ch. LEXIS 131 (Del. Ch. Sept. 8, 2004).

{91}  *Prescott* involved an appraisal proceeding brought by former minority shareholders of the defendant following defendant's merger into its parent corporation.  Plaintiffs in that case claimed that the fair value of their shares on the merger date was over five times what defendant was willing to pay.  *Id.* at *3.

{92}  The Delaware Court of Chancery accepted plaintiffs' valuation, noting that it was based on management projections available as of the date of the merger,

while defendant's evidence of value relied exclusively on "after-the-fact adjustments to such projections made during litigation." *Id.* at *75.

{93} *Prescott,* however, is inapposite because the management projections reviewed by the court in that case were entirely consistent with what the defendant was contemporaneously representing to all of its constituencies, including its shareholders, lenders, and outside financial analysts. As the court explained,

> [t]hose projections had been furnished to [defendant's] banks in circumstances where [defendant's] performance and prospects were being carefully scrutinized and where it was essential that [defendant's] actual performance met or exceeded those projections. Second, the projections had been 'vetted' for reliability by an independent firm, . . . which the banks had engaged for that purpose. Third, management had represented the projections as their best estimate of the future.

*Id.* at *52.

{94} In contrast, the 7 February 2003 CBH draft appraisal tendered by Anderson was not based on fair market value and was created for purposes of complying with an outside accounting requirement related to goodwill impairment.

{95} Moreover, unlike the projections in *Prescott*, the projections used by CBH to prepare its first draft appraisal relied on wildly optimistic sales figures that the Company never realistically expected to meet and that flatly contradicted the more realistic projections provided by the Company to its lenders.

{96} Similarly, the 18 March 2003 draft appraisal, while premised on fair market value, (a) was prepared for a specific purpose unrelated to the valuation of Anderson's stock, (b) was not a full fair market value appraisal, as would have been required for purposes of an ESOP appraisal, (c) was never finalized by CBH, and (d) relied on the same distorted sales projections generated by Anderson.

{97} Additionally, at trial Anderson put the onus on the Court to fill in substantial gaps in his valuation model to arrive at his preferred estimate of fair market value. The Court declines that invitation.

{98}   Instead, the Court concludes that the most reliable estimate of the fair market value of Anderson's stock at the time he was entitled to receive payment for it is $120,000.00, as calculated by M&S in November 2003.  (Joint Ex. 33.)

{99}   The M&S appraisal is the only evidence of value that attempts to honor the parties' agreement, by arriving at a fair market value of Anderson's shares as of 31 December 2002, based on the existence of a hypothetical ESOP.[9]

{100} At trial, Classic Coffee conceded that the $120,000.00 amount was the appropriate measure of value, but requested that it be allowed to pay Anderson in installments over sixty months, as provided by the terms of the Stockholders Agreement.  (Joint Ex. 1 ¶ 3.3(a).)

{101} However, because Classic Coffee materially breached the Stockholders Agreement, the Court **DENIES** that request.

{102} As for Anderson's remedy, generally, "where there is a material breach of the contract going to the very heart of the instrument, the other party to the contract may elect to rescind and is not bound to seek relief at law by an award for damages."  *Wilson v. Wilson,* 261 N.C. 40, 43, 134 S.E.2d 240, 242 (1964).

{103} Nevertheless, to rescind a contract "there must be, within a reasonable time after knowledge of the material breach, an election by the aggrieved party to cancel."  *Marantz Piano Co. v. Kincaid,* 108 N.C. App. 693, 696, 424 S.E.2d 671, 673 (1993).

{104} Anderson did not present evidence of such an election, nor did he request at trial that the Court rescind the Stockholders Agreement.

{105} Accordingly, the Court concludes that Anderson is entitled to judgment in his favor for $120,000.00, together with interest at 8% from 1 October 2003 until

---

[9] Two years later, M&S prepared a second fair market value appraisal of Anderson's interest in Classic Coffee, which resulted in a value of $192,000.00 for the shares. *See supra* ¶¶ 58-59.  After carefully reviewing the record, however, the Court credits the evidence presented by the Company at trial, which demonstrated that this valuation was based on an erroneous assumption (not made in the first M&S report) regarding the Company's overall debt (Joint Ex. 85), and that the value of the Company's shares as of 31 December 2004 was at or near zero.  Nevertheless, because the Stockholders Agreement explicitly protected Anderson from any downturn in the value of his stock following his termination without cause, the Company remains obligated to pay Anderson $120,000.00 for his shares. (Joint Ex. 1 ¶ 3.3(b).)

paid, said date being the sixty-first day following the effective date of Anderson's termination as a Company employee.

{106} Upon satisfaction of the judgment, Anderson shall tender his 15,000 shares to Classic Coffee.

## IV.
## JUDGMENT

{107} Based on the foregoing, it is **ORDERED** that judgment is entered for Defendant J. Michael Anderson in the sum of $120,000.00, with interest at the legal rate from 1 October 2003 until paid.

{108} Upon satisfaction of the judgment, Anderson shall tender his 15,000 shares to Classic Coffee.

{109} The costs of this action are taxed to Plaintiff.

**SO ORDERED**, this 31st day of January, 2008.