KAREN S. PATTERSON, Plaintiff v. PHILIP E. TAYLOR, Defendant

No. COA99-815

(Filed 5 September 2000)

**1. Appeal and Error— appealability—integrated separation agreement—already stipulated**

Although defendant contends the trial court erred in failing to conclude the parties' separation agreement was integrated, this issue does not need to be addressed because the parties' counsel stipulated at the hearing below and at oral argument that the agreement was integrated.

**2. Child Support, Custody, and Visitation— separation agreement—joint custody—extrinsic evidence**

The trial court erred by failing to consider extrinsic evidence of the parties' intent as to the meaning of their children's custody at the time they executed the separation agreement because: (1) the term "joint custody" in the agreement is ambiguous based on the fact that the parties' intent as to their responsibilities to communicate between themselves about the children was not specified in the agreement; (2) the trial court considered only evidence pertaining to communication between the parties after the agreement was executed; and (3) the trial court should have considered all relevant and material extrinsic evidence of the parties' intent at the time the agreement was executed.

Judge GREENE dissenting.

Appeal by defendant from order entered 13 April 1999 by Judge Charles L. White in Guilford County District Court. Heard in the Court of Appeals 18 April 2000.

*Hatfield & Hatfield, by Kathryn K. Hatfield, for plaintiff-appellee.*

*Robinson & Lawing, L.L.P., by C. Ray Grantham, Jr., and Kristin M. Major, for defendant-appellant.*

EDMUNDS, Judge.

Defendant Philip E. Taylor appeals the trial court's judgment finding that plaintiff Karen S. Patterson did not violate their separation agreement and ordering defendant to pay alimony. We reverse and remand for further proceedings.

Plaintiff and defendant were married on 14 February 1975. Three sons were born of the marriage. The parties separated on 16 March 1991 and later divorced. On 17 June 1991, plaintiff and defendant entered into a separation agreement (the agreement) in which they stated that "both parties are fit and proper persons to have care, custody and control of the minor children" and that it was in the "children's best interest that their custody be vested jointly in the parties." Pursuant to the agreement, plaintiff retained physical custody of the two younger children, while defendant retained physical custody of the eldest child. Defendant acknowledged under the agreement that plaintiff could move from North Carolina with the two children without interference from him. The agreement additionally provided that defendant would pay plaintiff alimony of $3,589 per month for 135 months, even if plaintiff re-married.

Plaintiff and the two sons moved to Oklahoma in 1992. Defendant maintained contact with the children by visiting them and telephoning them or plaintiff weekly. In September 1994, plaintiff informed defendant that their youngest son, who was then twelve years old, had experimented with marijuana on one occasion. (The behavior of this child is key to the actions taken by the parties; to preserve his privacy, we will refer to him in this opinion as "A.") Plaintiff added that "A" had told her that the other son in her custody had used LSD. Defendant responded with a letter to plaintiff expressing his concern that she was not treating the situation seriously and stating that he felt "A" should be removed from his current environment to defendant's residence in North Carolina. He ended the letter by writing:

> Knowing . . . you are still unwilling to give ["A"] a chance [in North Carolina], I can only insist that you respect my wishes on these following matters:

I will expect you to keep me informed directly and to advise the children's therapist to send me frequent reports of problems and progress. I will be contacting Ken directly to request these reports; if he asks you, please confirm that I have joint custody of the children and he is required by law to provide appropriate requested information to me just as he does to you.

I want you to send me copies of the drug testing you recently had performed on the boys. I want you to routinely (but at irregular and unexpected times) have drug testing repeated and have copies of those results sent to me also.

You must remember that I have joint custody of the children with you. My only interest lies in the desire to do what is best for all my children and my family.

Defendant contacted "A's" therapist in January 1995 to discuss the child. The therapist spoke of adjustment problems "A" was experiencing at school but did not mention drug use. Plaintiff continued to have "A" randomly tested for drugs from October 1994 through the summer of 1995. Although invoices for these tests were sent to defendant, the invoices did not indicate the test results, and defendant "assumed they were all negative." When "A" visited defendant in the summer of 1995, defendant had him tested and the results were negative.

However, in September, October, and December 1995, "A" tested positive for marijuana. Plaintiff did not advise defendant of these test results, nor did she inform him when she enrolled "A" in a weekly drug-counseling program. In 1996, plaintiff had an agreement with "A" whereby he was grounded until he received a negative drug test, but he was tested only when he chose to be tested. Plaintiff paid for tests with negative results, while "A" paid for tests with positive results. Defendant had no knowledge of or involvement in this agreement because plaintiff had not informed him about "A's" positive drug tests. When plaintiff spoke with defendant in 1996 after receiving positive test results, she testified that defendant, in reference to the children, "might have vaguely said, 'How are they doing?' And I would say, 'Well, they're doing okay.' "

"A" apparently continued using drugs because plaintiff observed that he was "getting more and more listless and losing weight . . . not having a lot of get up and go, [and] bad grades at school." In December 1996, plaintiff decided to place "A" in a voluntary residen-

tial program approximately ninety miles from her home. The program was to last six to twelve months, although it could extend for a longer period. On 20 January 1997, plaintiff wrote defendant to inform him that she was ending her dual health insurance on the children, but she did not mention that "A" would be entering the rehabilitation program. "A" began the program on 4 February 1997, and on 14 February 1997, plaintiff informed defendant of "A's" problems and his whereabouts.

Defendant visited "A" at the program in June 1997. However, after several unsuccessful attempts to contact "A" two months later, one of "A's" counselors informed defendant that "A" was no longer in the program. Convinced that plaintiff had breached the agreement, defendant stopped making alimony payments to plaintiff.

Plaintiff filed suit seeking to collect alimony payments due under the agreement. Defendant answered, denying he had breached the agreement, and counterclaimed, demanding specific performance or recission of the agreement. Defendant alleged that plaintiff breached the agreement by deciding unilaterally to place "A" in a residential substance abuse program without informing him, then removing "A" without defendant's knowledge or consent.

The case was heard without a jury. The trial court found that plaintiff did not breach the agreement because it placed no "affirmative obligation on . . . either party to provide medical records, or to consult with the other with regard to medical treatment, substance abuse treatment, and school decisions, or to obtain approval from the other for other decisions to be made in the child's life." The trial court also found "[t]here is no evidence that plaintiff failed to provide to the defendant any information which he requested related to the child's health, education, or substance abuse." The trial court ordered defendant to make the overdue payments and to pay plaintiff's attorney fees. Defendant appeals.

I.

[1] Defendant first argues that the trial court erred in failing to conclude that the agreement was integrated. Although the trial court did not make such a finding, counsel stipulated at the hearing below and at oral argument that the agreement was integrated. Therefore, we need not address this issue. Because the agreement is integrated, a party's breach of its provisions can relieve the non-breaching party from his or her alimony obligations. See *Nisbet v. Nisbet*, 102 N.C. App. 232, 402 S.E.2d 151 (1991).

PATTERSON v. TAYLOR

[140 N.C. App. 91 (2000)]

## II.

**[2]** We next address defendant's contention that the trial court erroneously failed to consider extrinsic evidence of the parties' intent as to the meaning of their children's custody at the time they executed the separation agreement. A marital separation agreement is subject to the same rules pertaining to enforcement as any other contract. *See Moore v. Moore*, 297 N.C. 14, 252 S.E.2d 735 (1979). When a trial judge sits without a jury, the court's findings of fact are binding on appeal if supported by any competent evidence in the record, but the court's conclusions of law are reviewed *de novo. See R.L. Coleman & Co. v. City of Asheville*, 98 N.C. App. 648, 651, 392 S.E.2d 107, 108-09 (1990).

The key to this case is the meaning of the phrase "custody [] vested jointly in the parties" in the context of the agreement. The agreement does not give a definition of the phrase, and both parties' briefs refer to this arrangement as "joint custody." Because the separate living arrangements for the children to which the parties agreed are not now contested, we assume that the phrase "custody [] vested jointly in the parties" is used in the separation agreement to mean "joint legal custody," as opposed to "joint physical custody." As in the case *sub judice*, the bench and bar have proven adept at distinguishing in practice between physical custody and legal custody. Nevertheless, we take this opportunity to suggest to courts and attorneys that precision in the use of these terms in fashioning orders and agreements may avoid later confusion and obviate litigation.

Because there is no question about the physical custody of the children in the case at bar, the following discussion of "joint custody" applies only to "joint legal custody." In addition, because the issue before us arises out of a voluntary separation agreement, our holding is limited to the interpretation of the term in such an agreement.

Other states have defined "joint custody" with varying degrees of specificity. *See, e.g.*, Cal. Fam. Code §§ 3002-3004 (West 1994); Ga. Code Ann. § 19-9-6 (1999); Ind. Code § 31-9-2-67 (1997); Mich. Comp. Laws § 722.26a (1992); N.M. Stat. Ann. § 40-4-9.1 (Michie 1999); Or. Rev. Stat. § 107.169 (1999). In contrast, North Carolina's governing statute refers to "joint custody" but contains neither a definition of the term nor a distinction between "joint legal custody" and "joint physical custody." N.C. Gen. Stat. § 50-13.2 (1999). (As noted above, where we use the term "joint custody" in this opinion, we specifically

mean "joint legal custody.") The statute is relatively unrestrictive, requiring a court ordering "joint custody" to focus on the best interests and welfare of the child, but otherwise allowing the court substantial latitude in fashioning a "joint custody" arrangement. We see no reason why parents entering a voluntary separation agreement should not have equal latitude. Therefore, parents entering such an agreement for "joint custody" may include or omit conditions pertaining to the child's education, health care, religious training, and the like. In short, the parties to a voluntary separation agreement have considerable freedom to reach an agreement for "joint custody" that takes into account various factors including the particularities of the relationships, the personalities involved, the bonds between family members, the needs of the parties, and any other appropriate features that together make each marriage and each family unique.

A practical result of the freedom to draft individualized separation agreements and set up specialized conditions of "joint custody" is that a corresponding responsibility is imposed on the parties to each agreement to allow for the possibility that matters initially "understood" between the parties may later become hotly contested issues. Moreover, the flexibility permitted those drafting custody agreements does not make the term "joint custody" infinitely elastic. The election by the parties to include the term (or, as here, its equivalent) without further definition implies a relationship where each parent has a degree of control over, and a measure of responsibility for, the child's best interest and welfare. *Cf. Black's Law Dictionary* 390 (7th ed. 1999) (defining "joint custody").

Nevertheless, in the absence of a controlling statutory definition or a definition in the voluntary agreement of the term "joint custody," difficulties may arise where the parties to a voluntary agreement use the term without detailing the means of its implementation. Defendant contends that the trial court should have considered extrinsic evidence as to the parties' intent at the time of the execution of the agreement when they agreed to "joint custody." Because of the many variables inherent in an action as complex in human terms as a separation or divorce, we agree with defendant that the bare term "joint custody" in a separation agreement may be ambiguous where there is no additional specific language in the agreement to define "joint custody" or to detail the pertinent duties and responsibilities of the parties. In such a case, the trial court may consider extrinsic evidence to determine the intent of the parties at the time of the execution of the separation agreement setting up "joint custody." *See Bicket*

**PATTERSON v. TAYLOR**

[140 N.C. App. 91 (2000)]

*v. McLean Securities, Inc.*, 124 N.C. App. 548, 552-53, 478 S.E.2d 518, 521 (1996).

In addition, a trial court seeking to determine the intent of the parties at the time a voluntary agreement was signed may also consider extrinsic evidence of the conduct of the parties as they carry out the agreement. Indeed, because actions speak louder than words, such evidence may be particularly persuasive; for instance, in the case at bar, the agreement was executed in 1991 and the parties lived under it for several years. "In contract law, where the language presents a question of doubtful meaning and the parties to a contract have, practically or otherwise, interpreted the contract, the courts will ordinarily adopt the construction the parties have given the contract *ante litem motam.*" *Davison v. Duke University*, 282 N.C. 676, 713-14, 194 S.E.2d 761, 784 (1973) (citations omitted). However, even where a trial court concludes that extrinsic evidence of the parties' behavior implementing the agreement is probative of the parties' intent at the time of the execution of the agreement, the court is not free to consider such evidence to the exclusion of other probative and admissible evidence of the parties' intent when the agreement was executed. In other words, if a trial court considers extrinsic evidence pertaining to interpretation of an ambiguous term, it must consider all relevant and material evidence. It is then the responsibility of the trial court to determine the weight and credibility of that evidence.

Turning now to the case at bar, the trial court correctly noted that the agreement is "silent as to the affirmative obligation on behalf of either party to provide medical records, or to consult with the other with regard to medical treatment, substance abuse treatment, and school decisions, or to obtain approval from the other for other decisions to be made in the child's life." Such silence is not incompatible with "joint custody" because as noted above, unless the parties agree to the contrary, each parent having joint custody pursuant to a voluntary agreement has rights and responsibilities in the child's upbringing, even if these rights and responsibilities are not defined in the agreement. Nevertheless, the term "joint custody" is ambiguous because the parties' intent as to their responsibilities to communicate between themselves about the children was not specified in the agreement. The trial court considered only evidence pertaining to communication between the parties after the agreement was executed. Therefore, the trial court erred when it did not also consider all relevant and material extrinsic evidence of the parties' intent at

the time the agreement was executed. On remand, the court shall permit the parties to present extrinsic evidence of their intent as to this issue at the time the agreement was executed. Once the court has considered the parties' understanding of "joint custody" along with other admissible evidence, the court can determine the applicable duties and responsibilities of the parties. The court may then address the issue of whether plaintiff breached the separation agreement.

The trial court's holding that plaintiff did not breach the separation agreement is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

Judge McGEE concurs.

Judge GREENE dissents.

Judge GREENE dissenting.

This case presents the single issue of whether the agreement between the parties, vesting child custody "jointly in the parties," is ambiguous so as to permit the introduction of extrinsic evidence regarding the intent of the parties with respect to the agreement. I agree with the majority that the agreement is ambiguous and this case must, therefore, be reversed and remanded for the taking of evidence on the intent of the parties. I do not agree, however, that the inclusion of joint custody language in the agreement "without further definition implies a relationship where each parent has a degree of control over, and a measure of responsibility for, the child's best interest and welfare."

Parties to a custody agreement have complete flexibility in defining the meaning of "joint custody" as it is used in their agreement. *See Lexington Ins. Co. v. Tires into Recycled Energy and Supplies, Inc.*, 136 N.C. App. 223, 225, 522 S.E.2d 798, 800 (1999) (parties may " 'bind themselves as they see fit' by a contract, unless the contract would violate the law or is contrary to public policy") (quoting *Hall v. Refining Co.*, 242 N.C. 707, 709-10, 89 S.E.2d 396, 397-98 (1955)), *disc. review denied*, 351 N.C. 642, —— S.E.2d —— (2000). When custody of a child is determined pursuant to a custody agreement, any degree of control over or measure of responsibility for the child's best interests

WESTMINSTER HOMES, INC. v. TOWN OF CARY ZONING BD. OF ADJUST.

[140 N.C. App. 99 (2000)]

must be found in the specific language of the agreement[1] or, in the case of an ambiguous agreement, when extrinsic evidence shows the parties intended some degree of control or responsibility to apply. *See White v. Graham*, 72 N.C. App. 436, 438, 325 S.E.2d 497, 499 (1985) (a separation agreement is a contract and is construed in accordance with the laws governing contracts).

In this case, the parties stated in their agreement that custody was to be vested "jointly in the parties." Because the agreement is ambiguous as to the meaning of the joint custody language, I would remand this case to the trial court for the taking of extrinsic evidence regarding the parties' intended meaning of this language. The meaning of the language, however, must be construed based solely on the intent of the parties.

---

1. I acknowledge the general rule that when construing contracts, ordinary words are given their ordinary meaning unless an alternative meaning is provided. *Biggers v. Evangelist*, 71 N.C. App. 35, 42, 321 S.E.2d 524, 529 (1984), *disc. review denied*, 313 N.C. 327, 329 S.E.2d 384 (1985). This rule, however, has no application to the agreement in this case, as no ordinary meaning for the joint custody language used in the agreement exists. Indeed, if an ordinary meaning existed for the joint custody language used in the agreement, then the agreement would not be ambiguous.