Vogler Reynolda Road, LLC v. SCI N.C. Funeral Servs., Inc., 2017 NCBC 28.

STATE OF NORTH CAROLINA

COUNTY OF FORSYTH

VOGLER REYNOLDA ROAD, LLC,

        Plaintiff,

    v.

SCI NORTH CAROLINA FUNERAL
SERVICES, INC.,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 94

OPINION AND FINAL JUDGMENT

1.      THIS MATTER came on for trial without a jury before the undersigned commencing on January 10, 2017.  The matter is now ripe for final determination, and the Court issues its Opinion and Final Judgment.

    *Ward and Smith, P.A., by John M. Martin, for Plaintiff.*

    *Moore & Van Allen, PLLC, by Anthony T. Lathrop and Glenn E. Ketner III, for Defendant.*

Gale, Chief Judge.

## I.    INTRODUCTION

2.      Plaintiff is the successor landlord and Defendant is the successor tenant to the Amended and Restated Lease Agreement, effective as of January 1, 1990 ("1990 Lease").  The 1990 Lease provided an initial term followed by four automatic five-year renewals.  The initial term is defined as "a period of five (5) years commencing with the 1st day of January, 1990, and expiring on the 31st day of December, 1995." (Joint Ex. 17, at 3.)  The renewal terms are stated to begin on January 1, 1996; January 1, 2001; January 1, 2006; and January 1, 2011.  (Joint Ex. 17, at 6–9.)

3.      There is an obvious inconsistency in the initial term, which states that the term is a five-year period, but the calendar dates are a six-year period.  Neither party noticed the inconsistency in the initial term until July 2014, during the last renewal term.  Until then, all parties proceeded on the assumption that the 1990 Lease expired on December 31, 2015.

4.      The 1990 Lease affords the tenant an option to purchase the property, which expires when the lease expires.  The 1990 Lease provides that rent will be doubled for any period that the tenant holds over.

5.      The parties' disputes fall into three categories.  First, they disagree about when the 1990 Lease expired.  Plaintiff contends that the stated initial term contained a scrivener's error because the parties intended it to be a five-year term, and that the 1990 Lease should be reformed to state that the initial term expired on December 31, 1994, the last renewal term began on January 1, 2010, and the final term expired on December 31, 2014.  Defendant contends that the calendar dates specified in the 1990 Lease for both the initial term and each renewal term reflect the parties' actual agreement, that reformation is not appropriate, and that the 1990 Lease did not expire until December 31, 2015.  Alternatively, Defendant asserts equitable defenses against reformation.

6.      Second, the parties disagree whether the option to purchase has expired.  Defendant made no effort to exercise that option in 2014, so its right to purchase depends on the lease not expiring until December 31, 2015.  Plaintiff contends that even with a December 31, 2015 expiration date, the option to purchase expired

because Defendant did not satisfy its performance obligation during the lease term. Defendant contends that it gave timely notice of its intent to exercise the option and its further performance obligations have been suspended by the litigation.

7. Third, the parties disagree as to whether Defendant is obligated to pay holdover rent between the date that the lease expired and the date of the Court's judgment.

8. Based on the following Findings of Fact and Conclusions of Law, the Court issues its Opinion and Final Judgment that the 1990 Lease expired on December 31, 2015; that Defendant gave timely notice of its intent to exercise its option to purchase but failed to satisfy its obligation to establish a purchase price before the lease expired; and that Defendant is obligated to surrender the property and pay holdover rent from and after January 1, 2016.

## II. PROCEDURAL HISTORY

9. Plaintiff initiated this action on January 9, 2015. The case was designated as a mandatory complex business case on January 13, 2015, by order of Chief Justice Mark Martin, and assigned to the undersigned that same day.

10. On February 2, 2016, Plaintiff filed its Supplemental Complaint. On March 1, 2016, Defendant filed its answer, defenses, and second amended counterclaim. Both parties seek the Court's declaratory relief as to the lease expiration date and Defendant's right to purchase the leased property. Defendant pled that the affirmative defenses of estoppel, waiver, laches, and unclean hands bar Plaintiff's reformation claim and now seeks to assert an additional affirmative

defense based on a statute of repose or a statute of limitations. Defendant's counterclaim seeks to recover damages if the 1990 Lease expired on December 31, 2014, because Plaintiff failed to timely notify Defendant of its contention.

11.    Neither party demanded a jury trial. Following a full course of discovery, trial commenced on January 10, 2017, at the North Carolina Business Court, 1834 Wake Forest Road, Room 3206, Winston-Salem, North Carolina. After the close of evidence, the parties submitted posttrial briefs and proposed findings of fact and conclusions of law on January 25, 2017. The Court heard final arguments and took the matter under submission on January 31, 2017.

12.    All issues and claims are now ripe for determination.

## III.    FINDINGS OF FACT

13.    Any determination later stated as a conclusion of law that should have been stated as a finding of fact is incorporated in these Findings of Fact.

14.    The Court incorporates the extensive stipulations stated in the Revised Joint Proposed Final Pretrial Order entered on January 10, 2017.

15.    The Court admitted into evidence 150 joint exhibits, as well as additional exhibits introduced at various video depositions, and received testimony both by witnesses appearing at trial and by video depositions.

### A. The Parties and Related Witnesses

16.    F. Eugene Vogler ("Mr. Vogler") established Vogler & Sons, Inc. ("Vogler & Sons"), which operated a funeral home at 2951 Reynolda Road, Winston-Salem, North Carolina (the "Property"). After Mr. Vogler died on October 1, 2002, Plaintiff Vogler Reynolda Road, LLC ("Plaintiff") was formed to own the Property and is the

successor landlord of the 1990 Lease. Plaintiff's members are Mr. Vogler's four children: Eugene Vogler III ("Gene Vogler"), John Mosby Vogler ("Mosby Vogler"), Joseph Vogler, and Whitley Vogler Rotgin ("Whitley Rotgin"). Whitley Rotgin is married to Charles Rotgin, an experienced real-estate professional.

17. Plaintiff's initial manager was John Royster, Mr. Vogler's long-time personal accountant. Prior to his death, Mr. Vogler regularly entrusted his financial affairs and decisions to Mr. Royster, as well as to William Petree, Mr. Vogler's long-time personal counsel, and members of the law firm Petree, Stockton & Robinson. Stephen Johnson ("Mr. Johnson") was at relevant times an associate at that firm.

18. Effective December 21, 1988, Vogler & Sons was acquired by Sentinel Group, Inc. ("Sentinel"), which operated funeral and cremation facilities throughout the Southeast. Jerald Pullins was Sentinel's president and CEO. Timothy Birch was one of Sentinel's vice presidents. Walter Cook was Sentinel's general counsel. In 1990, Sentinel refinanced its acquisition line of credit with Provident Services, Inc. ("Provident").

19. Service Corporation International acquired Sentinel, effective April 5, 1991, and then formed SCI North Carolina Funeral Services, Inc., the Defendant in this litigation and the successor tenant of the 1990 Lease. The Court refers to these parties collectively as "SCI." Ms. Irmgard Johnson ("Ms. Johnson") is SCI's Manager of Real Estate and Leases.

B. <u>The Chronological Leases</u>

20.     Mr. Vogler owned the Property during his lifetime.  He initially leased the Property to Vogler & Sons pursuant to a lease that had a fifteen-year term, beginning March 1, 1970, and ending February 28, 1985 ("1970 Lease").  (Joint Ex. 1, at 1.)  The 1970 Lease, with its amendments, was in force until January 1, 1990.

21.     On January 17, 1985, Mr. Vogler and Vogler & Sons executed an amendment to the 1970 Lease that extended the term through February 28, 1990, and gave Vogler & Sons the option for two five-year renewals ("1985 Amendment").  (Joint Ex. 2, at 2, 4–5.)  The 1985 Amendment provided that the base rent be adjusted upon any renewal based on the Consumer Price Index ("CPI") and carried forward the provision from the 1970 Lease that, in addition to base rent, the tenant would make an annual payment based on a percentage of the funeral home's revenue ("Override").  (Joint Ex. 2 at 3–4.)

22.     Mr. Vogler and Sentinel negotiated a substantial lease amendment in connection with Sentinel's 1988 acquisition of Vogler & Sons ("1988 Lease Amendment").  (Joint Ex. 11.)  Negotiations were between Mr. Pullins and Mr. Birch, on behalf of Sentinel, and Mr. Rotgin, with financial advice from Mr. Royster, on behalf of Mr. Vogler.  Collectively, these witnesses have a clear recollection of the 1988 Lease Amendment's essential terms.

23.     The 1988 Lease Amendment made at least three substantive changes to the existing lease.  First, the 1988 Lease Amendment provided for a maximum twenty-five-year lease term, divided into five five-year renewal terms, to begin on

March 1, 1990, with the final renewal term beginning on March 1, 2010, and ending on February 28, 2015. (Joint Ex. 11, at 13–17; *see* Joint Ex. 2, at 4–6.) Second, the 1988 Lease Amendment included an option to purchase with detailed provisions as to when and how it must be exercised ("Purchase Option"). (Joint Ex. 11, at 20–22.) Third, the 1988 Lease Amendment provided for double rent should the tenant hold over. (Joint Ex. 11, at 14.)

24. A Memorandum of Lease was recorded for the 1988 Lease Amendment, stating that the 1970 Lease, as amended, had a maximum term of forty-five years—a period from March 1, 1970, to February 28, 2015. (Joint Ex. 12.)

25. The 1990 Lease was executed as a new lease rather than as an amendment to the earlier amended 1970 Lease. In contrast to the 1988 Lease Amendment negotiations, Mr. Pullins and Mr. Birch have no independent recollection of any negotiations of the 1990 Lease. Mr. Rotgin and Mr. Royster were not involved in negotiating the 1990 Lease at all, and in fact, neither became aware of the 1990 Lease until several years later.

26. While the 1990 Lease was executed as a new lease, it was intended to incorporate the essential terms of the 1988 Lease Amendment while changing the lease periods to be based on the calendar year.

27. The 1990 Lease became effective on January 1, 1990. (Joint Ex. 17, at 1.) Sentinel executed the 1990 Lease on May 24, 1990, and Mr. Vogler executed it on October 10, 1990. (Joint Ex. 17, at 42.)

28. The 1988 Lease Amendment provided that the first five-year renewal term would begin on March 1, 1990, and that the maximum twenty-five-year term was between March 1, 1990, and February 28, 2015. When changing the term to a calendar-year period beginning on January 1, 1990, the 1990 Lease necessarily would have to either shorten or extend the twenty-five-year maximum term. A period of January 1, 1990, to December 31, 2014, would shorten that maximum term by two months. A period of January 1, 1990, to December 31, 2015, would extend that maximum term by ten months.

29. Mr. Cook was the primary draftsmen of the 1990 Lease. He drafted the 1990 Lease to define the initial term as "a period of five (5) years commencing with the 1st day of January, 1990, and expiring on the 31st day of December, 1995." (Joint Ex. 17, at 3.) Without more, the language allows for two interpretations: (1) that the parties intended for the initial term to be six years, as defined by the stated calendar dates, or (2) that the parties intended for the initial term to be five years, and the calendar dates are incorrectly stated.

30. If the intent was for the initial term to be only five years, the lease contains a scrivener's error in stating the expiration date for the initial term as December 31, 1995, rather than December 31, 1994, and that error is compounded by having the renewal terms begin on January 1, 1996; January 1, 2001; January 1, 2006; and January 1, 2011, rather than on January 1, 1995; January 1, 2000; January 1, 2005; and January 1, 2010. (Joint Ex. 17, at 3, 6–9.) If the intent was for the initial term to be longer than five years to accommodate moving the lease term from March

1 to January 1 without shortening the twenty-five-year maximum term allowed by the 1988 Lease Amendment, then the only scrivener's error is describing the initial term as five years rather than six years.

31.     The 1990 Lease carried forward the provision that the annual base rent would be adjusted at the beginning of each five-year renewal term based on the CPI increase during the "preceding five (5) year lease period." (*E.g.*, Joint Ex. 17, at 6.) Plaintiff argues that for the renewal term beginning January 1, 1996, the CPI rent adjustment would have to be based on the CPI increase during the preceding six-year lease period if the correct initial term ran from January 1, 1990, to December 31, 1995. That is not a necessary conclusion, as the CPI rent adjustment on January 1, 1996, could be based on the CPI increase during the last five years of a six-year term.

32.     When the 1990 Lease was being negotiated, the existing term of the 1988 Lease Amendment would end on February 28, 1990, and Mr. Vogler would have received the CPI-based rent increase when the lease renewal term began on March 1, 1990. Gene Vogler has no recollection of the lease negotiations themselves, but does recall that, at Sentinel's request, he secured Mr. Vogler's agreement to receive the increased rent two months early. Gene Vogler recalls nothing further regarding the 1990 Lease, and indicated that had he received any letters regarding the lease, he would not have read them but would have forwarded them to Mr. Petree or his law firm. He testified that the lawyers were the only ones who negotiated the 1990 Lease and Mr. Vogler depended upon his lawyer to finalize the terms of the 1990 Lease.

## C. Other Documents Contemporaneous with the 1990 Lease

33.     Each party argues that other contemporaneous documents support their position.   The documents include correspondence preceding execution of the 1990 Lease and other documents executed in reference to the 1990 Lease and the refinancing transaction that required the new lease.

### (1) Correspondence of counsel

34.     The 1990 Lease was drafted by Mr. Cook and reviewed by Mr. Johnson, under Mr. Petree's supervision.   There are no available drafts of the 1990 Lease.   The parties located limited correspondence regarding the 1990 Lease.   Neither Mr. Cook nor Mr. Johnson has any independent recollection regarding the 1990 negotiations beyond the documents.   Mr. Cook did not recall any letters until they were presented to him at his deposition.   While letters suggest that Mr. Birch may have had some involvement in the 1990 Lease negotiations on behalf of Sentinel, he has no recollection of specific negotiations other than shown in the documents.   Mr. Birch was able to testify only about Sentinel's general lease practices at the time.

35.     Mr. Cook sent a letter dated January 24, 1990, to Gene Vogler, copied to Mr. Birch, referring to the 1990 Lease. (Joint Ex. 18.)  The letter states that the 1990 Lease is based on the 1970 Lease, as amended, but provides for a lease term based on "a calendar year basis, effective January 1, 1990," and that the "term otherwise running from March 1, 1990 through February 28, 1995, will instead run from January 1, 1990 through December 31, 1995, and will be followed by four consecutive five-year renewal periods." (Joint Ex. 18, at 1.)  Later correspondence suggests that

Mr. Cook's initial draft of the 1990 Lease refers to this initial term as a five-year period, although his letter does not.

36. Mr. Johnson reviewed the draft of the 1990 Lease at Mr. Petree's direction. On April 23, 1990, Mr. Johnson faxed Mr. Vogler a multipage letter containing forty-one numbered paragraphs commenting on specific provisions in the draft of the 1990 Lease, and presumably enclosing a copy of Mr. Cook's draft of the 1990 Lease. (Joint Ex. 19.) Numbered paragraph four of Mr. Johnson's letter stated:

> At the bottom of page 3, the five year term commencing January 1, 1990 and expiring on the 31st day of December 1995 effectively extends the term. Under the existing Amendment, the initial term ends on February 28, 1990 and is extended automatically for five five-year terms so that the maximum term ends on February 28, 2015. Under the Amended and Restated Lease Agreement, the maximum term ends on December 31, 2015.

(Joint Ex. 19 ¶ 4.)

37. Mr. Johnson's letter did not note the inconsistency in referring to the initial term as a five-year period while stating a six-year calendar period. (*See* Joint Ex. 19 ¶ 4.)

38. Mr. Johnson does not believe that he directly spoke with Mr. Vogler regarding the 1990 Lease.

39. Mr. Cook responded to Mr. Johnson's letter on April 25, 1990. (Joint Ex. 20.) Referring to numbered paragraph four of Mr. Johnson's letter, Mr. Cook stated, "[t]his comment was intended for Mr. Vogler's benefit, but I believe reflects the business deal on which the parties have agreed." (Joint Ex. 20, at 1.) Mr. Cook does not recall ever noticing the inconsistency in how he defined the initial term until he learned of it during this litigation.

40.     Both Mr. Cook and Mr. Johnson specifically noted that the 1990 Lease had effectively extended the lease term when compared to the 1988 Lease Amendment.  (Joint Ex. 17, at 3; *see* Joint Ex. 19 ¶ 4; Joint Ex. 20, at 1.)

41.     These two letters are the only documentary evidence of negotiations regarding the 1990 Lease other than the final executed documents, which in addition to the 1990 Lease itself include a memorandum of lease and a Landlord Estoppel Certificate.

### (2) The Recorded New Memorandum

42.     Mr. Vogler signed a new memorandum of lease regarding the 1990 Lease on October 10, 1990—the same day he executed the 1990 Lease.  (Joint Ex. 24.) Sentinel executed that document on October 17, 1990.

43.     On October 19, 1990, Mr. Johnson advised Sentinel that the new memorandum that had been executed contained an error because it did not reference the Purchase Option.  (Joint Ex. 23.)  Mr. Johnson prepared and enclosed a revised new memorandum that added a reference to the Purchase Option, but made no other changes.  Sentinel executed the revised new memorandum on November 9, 1990, and Mr. Vogler executed it on December 6, 1990—the day it was recorded ("Recorded New Memorandum").  (Joint Ex. 26.)

44.     The Recorded New Memorandum referred to "a term beginning the first day of January 1, 1990, and continuing for a maximum period of twenty-five (25) years, including extensions and renewals."  (Joint Ex. 26, at 2.)  Mr. Johnson recalls being advised by Mr. Petree that the maximum term was twenty-five years.  This, of

course, was the basic agreement of the 1988 Lease Amendment, but as noted, the maximum term as measured by the 1988 Lease Amendment would have to be either shortened or extended when changing the lease term to be based on a calendar year.

45. The definition in the initial term of the 1990 Lease as executed apparently did not change from the draft of the 1990 Lease that Mr. Cook and Mr. Johnson discussed in their letters. There is no evidence that Mr. Johnson ever modified his observation that the 1990 Lease effectively extended the lease term from that provided by the 1988 Lease Amendment or that the 1990 Lease would expire on December 31, 2015. Mr. Johnson also apparently never recognized that a lease beginning January 1, 1990, and ending December 31, 2015, would have a maximum term of twenty-six years.

46. The Recorded New Memorandum did not specify the final termination date of the 1990 Lease. It did provide that, "[i]n the event of any conflict between the terms of this memorandum and [the 1990 Lease], the terms and provisions of [the 1990 Lease] shall govern." (Joint Ex. 26, at 3.)

### (3) The Landlord Estoppel Certificate

47. Sentinel and Provident closed their refinancing on November 13, 1990. In connection with the closing of the refinancing, Mr. Vogler signed a Landlord Estoppel Certificate that provided that the "[l]andlord hereby confirms that the [l]ease term commenced January 1, 1990, and, unless properly renewed, will terminate on December 31, 1995." (Joint Ex. 27 ¶ 7.) The Landlord Estoppel

Certificate did not refer to this initial term as being for either five years or six years, and it did not describe the renewal periods.

### D. The Parties' Course of Performance Under the 1990 Lease

48. In addition to contending that the calendar dates specified in the 1990 Lease accurately reflect the parties' intent at the time of execution, SCI contends that any ambiguity should be resolved by the course of performance between the parties. Plaintiff counters that SCI, as the successor tenant, cannot use its own course of performance to prove the intent of the original parties to the lease.

49. After SCI acquired Sentinel in 1991, it prepared a recurring-payables schedule, dated October 24, 1991, for its various leases. The schedule noted for the 1990 Lease that the initial term was from January 1, 1990, to December 31, 1995, and that the first CPI rent adjustment would occur on January 1, 1996. (Joint Ex. 32.) SCI also created an abstract of the 1990 Lease that stated that the automatic five-year renewal terms began on the January 1 anniversary dates stated in the 1990 Lease, beginning January 1, 1996, and showed a final expiration date of December 31, 2015. (Joint Ex. 38, at 3.) There were other documents, including Lease Expirations and Renewal Options Reports, that tracked the 1990 Lease on the basis of the five-year renewal terms provided by the lease, but these reports did not state a specific final termination date. (*See, e.g.*, Joint Ex. 55, at 40; Joint Ex. 59, at 21.)

50. Mr. Vogler's death was one of the events that could trigger SCI's Purchase Option, as it was first written in the 1998 Lease Amendment and then carried forward in the 1990 Lease. On November 4, 2002, Mr. Rotgin, then unaware

that the 1990 Lease had been executed, notified SCI of Mr. Vogler's death and requested that SCI advise whether it intended to execute the Purchase Option. (Joint Ex. 41.) Ms. Johnson responded on SCI's behalf and referred to the 1990 Lease in her letter to Mr. Rotgin. Mr. Rotgin did not notice this reference and continued to believe that the 1988 Lease Amendment remained in force.

51. Mr. Royster from time to time reviewed calculations of the Override payments due under the lease. The basic method of calculating the Override payments did not change from the 1988 Lease Amendment to the 1990 Lease. Thus, Mr. Royster did not need to be aware of the 1990 Lease to conduct such review.

52. Mr. Royster became Plaintiff's manager when it was formed following Mr. Vogler's death in 2002. In February 2008, Mr. Royster learned of the 1990 Lease when he was renewing arrangements for maintenance and repairs at the Property. He realized that neither he nor anyone on the Vogler family's behalf had a copy of the 1990 Lease. (Joint Ex. 57.) Ms. Johnson provided Mr. Royster a copy of the 1990 Lease at his request.

53. Mr. Royster and Ms. Johnson regularly communicated regarding the CPI rent adjustments at the beginning of each renewal term. The recalculations were made and accepted on the January 1 renewal dates stated in the 1990 Lease—January 1, 1996; January 1, 2001; January 1, 2006; and January 1, 2011. (*See, e.g.*, Joint Ex. 54.) Neither of them made a calculation retroactive to January 1, 1990. Neither Ms. Johnson nor Mr. Royster noted the inconsistency in how the 1990 Lease's initial term was stated. Neither raised questions as to the timing of the renewal

periods stated in the 1990 Lease or the date on which CPI rent adjustments were made.

54.    Mr. Royster and Ms. Johnson corresponded on January 21, 2011, acknowledging that the final five-year renewal period had begun on January 1, 2011. (Joint Ex. 73.)  On that same date, Mr. Royster prepared a spreadsheet reflecting the CPI rent increases extending back to March 1, 1990.  (Joint Ex. 74.)  The last line of his spreadsheet reflected a final lease term of January 1, 2010, to December 31, 2014. (Joint Ex. 74.)  In response to the Court's inquiry at trial, Mr. Royster stated that, to accurately reflect his understanding at the time he prepared the spreadsheet, the final lease term on the spreadsheet should have been stated as January 1, 2011, to December 31, 2015.

55.    Until summer 2014, Plaintiff and SCI had a mutual understanding that the renewal dates stated in the 1990 Lease were correct and that the final term of the lease began on January 1, 2011, and ended on December 31, 2015.  No witness testified to any different understanding prior to July 2014.

56.    SCI conducted an initial review of Sentinel's leases in connection with its due diligence before acquiring Sentinel in 1991, but Ms. Johnson understood that the review was limited to examining final expiration dates and the inclusion of a purchase option.  There is no indication that anyone during this due diligence noted the inconsistency in the definition of the initial term of the 1990 Lease.

57.    There is no evidence suggesting that Mr. Vogler or others on his behalf would likely have undertaken a retroactive review of the initial and renewal lease

terms. Mr. Vogler had his rent receipts directly deposited into an investment account. There is no evidence that Mr. Vogler ever questioned or responded to Mr. Johnson's April 1990 letter indicating that the final expiration of the 1990 Lease was December 31, 2015.

58.    As there is no evidence that any party discovered the inconsistency in the 1990 Lease prior to July 2014, there is no evidence suggesting that the parties consciously failed to take timely action regarding the inconsistency prior to July 2014. The Court concludes that the parties to the 1990 Lease were not negligent by failing to discover the inconsistency before July 2014.

E.  The Dispute as to the Final Expiration Date Arises

59.    Mosby Vogler left Vogler & Sons in 2006 to establish his own funeral home in Winston-Salem.  Sometime before or around July 1, 2014, Mosby Vogler reviewed the 1990 Lease to confirm its expiration date because he was considering lease options for his own funeral home.

60.    Sometime on or around July 1, 2014, Mr. Rotgin and Mosby Vogler had discussions regarding the 1990 Lease's expiration date and for the first time recognized the inconsistency in how the initial term had been defined, leading to the question whether the 1990 Lease would expire on December 31, 2014, rather than on December 31, 2015, as they had understood until then. (*See, e.g.*, Joint Ex. 84.) Mr. Rotgin suggested that Plaintiff contact SCI to solicit SCI's position regarding the inconsistency and its effect on the 1990 Lease's expiration date.

61.     If the 1990 Lease would expire on December 31, 2014, SCI would be required to give notice of its intent to exercise the Purchase Option by October 2, 2014.

62.     On October 6, 2014, Plaintiff notified SCI of its contention that the 1990 Lease expired on December 31, 2014. Mr. Royster, who was still Plaintiff's manager, wrote Ms. Johnson, stating:

> Based upon a recent review of the lease, the last five-year lease extension period expires on December 31 of this year, and the Lease Agreement terminates effective on that date.
>
> Since SCI has elected not to exercise the Purchase Option as set forth in Section 26 of the Lease Agreement, we need to discuss an orderly transition of the occupancy of the leased premises. As a part of that transition, we will want to inspect the premises on or before December 1, 2014 with a representative of [SCI] in order to identify and resolve any issues.

(Joint Ex. 88.)

63.     This letter was the first indication to SCI that Plaintiff contended that the 1990 Lease would expire before December 31, 2015. SCI did not send a written response to the letter. There is no evidence that SCI stated its intent to exercise the Purchase Option during 2014.

64.     In December 2014, the parties reached an agreement that SCI would remain in possession of the Property pending a court determination regarding the 1990 Lease's expiration date. There is no evidence that this agreement further included an agreement to toll any performance obligations of the Purchase Option or to suspend any obligation to pay holdover rent.

65. SCI contends that Plaintiff's reformation claim should be barred, and that Plaintiff acted in bad faith and breached an implied covenant of good faith by Plaintiff not notifying SCI until October 6, 2014, of its contention that the 1990 Lease would expire on December 31, 2014, effectively precluding SCI from being able to exercise the Purchase Option. SCI suggests that Plaintiff did so to benefit Mosby Vogler in connection with his competing funeral home. SCI seeks damages as a result of that breach. Any such damages would occur only if the Purchase Option was lost because the 1990 Lease expired on December 31, 2014.

66. Mosby Vogler was candid in testifying that he looked forward to SCI being "gone." But, he only owns a 25% interest in Plaintiff. There is no evidence of any agreements by, or negotiations between, Mosby Vogler and Plaintiff providing that Plaintiff would sell or lease the Property to Mosby Vogler after the 1990 Lease and the Purchase Option expired.

67. There is no other evidence upon which a finding of bad faith or the breach of an implied covenant of fair dealing could rest. The Court concludes that SCI's claim of bad faith has no evidentiary support.

F. <u>The Weight of the Evidence is that the Calendar Dates Specified in the 1990 Lease Reflect the Parties' Intent, and the Last Renewal Term Commenced on January 1, 2011, and Expired on December 31, 2015.</u>

68. The evidence is clear that, when entering the 1990 Lease, the parties intended to change the lease term stated in the 1988 Lease Amendment to coincide with a calendar year. There is no specific evidence that the parties intended to shorten the maximum twenty-five-year term provided by the 1988 Lease Amendment

commencing on March 1, 1990. There is specific evidence that counsel for both landlord and tenant understood that the 1990 Lease extended the maximum lease term and that the 1990 Lease would expire on December 31, 2015, rather than February 28, 2015, as provided by the 1988 Lease Amendment.

69. The calendar period for the initial term—January 1, 1990, to December 31, 1995—is six years. There is no clear evidence that the parties intended that a description of that term as a five-year period would take precedence over the stated specific calendar dates.

70. While there is an inconsistency in the definition of the initial term of the 1990 Lease, there is no such inconsistency in the definition of the five-year renewal terms, as each is defined as a five-year period beginning on January 1 and expiring on December 31 in the following fifth year. The 1990 Lease clearly states that five-year renewal terms would begin on January 1, 1996; January 1, 2001; January 1, 2006; and January 1, 2011. Correspondence between counsel for the parties reflects that, prior to the execution of the 1990 Lease, the parties understood that the final expiration date of the 1990 Lease would be December 31, 2015.

71. The Court need not consider the subsequent course of performance to conclude that the parties initially intended for the lease to expire on December 31, 2015. However, this conclusion is consistent with the parties' subsequent course of performance.

72. In fact, reforming the lease as Plaintiff requests would be inconsistent with Mr. Johnson's advice to Mr. Vogler in his April 30, 1990 letter that the 1990

Lease "effectively extend[ed] the term," and that the last renewal term "ends on December 31, 2015," (Joint Ex. 19 ¶ 4,) and with the manner in which the parties approached renewals under the 1990 Lease.

73. The Landlord Estoppel Certificate confirmed an initial term of January 1, 1990, to December 31, 1995, and does not support the reformation of the 1990 Lease.

74. The Recorded New Memorandum does not constitute clear evidence supporting reformation of the 1990 Lease.

75. The greater weight of the evidence establishes that the stated calendar dates in the 1990 Lease reflect the parties' intent that the initial lease period was from January 1, 1990, to December 31, 1995, followed by four five-year renewal terms, the first commencing on January 1, 1996, and the last renewal expired on December 31, 2015.

76. Having so concluded, the Court need not further consider SCI's equitable defenses that Plaintiff's reformation claim should be barred.

## G. SCI's Attempt to Exercise the Purchase Option

77. The Purchase Option in the 1990 Lease provides in relevant part that

> LESSEE shall have the option to purchase (the "Purchase Option") the Premises (including, without limitation, improvements located thereon) at any time during the original term or any validly exercised renewal or option period of this Lease . . . . In no event shall the Purchase Option survive the expiration or termination of this Lease. . . . The purchase price for the Premises upon the exercise of the LESSEE'S Purchase Option shall be the fair market value of the Premises at closing as determined by an appraiser selected by LESSEE and reasonably satisfactory to LESSOR. Any cost of such appraisal shall be borne by LESSEE. If LESSOR does not accept such appraisal,

then LESSOR shall select an appraiser and the purchase price shall be determined by agreement between the two appraisers. Any cost of such second appraiser shall be borne by LESSOR. If the appraisers cannot agree, the appraisers shall select a third appraiser, and the average of the three appraisals shall conclusively determine the purchase price. The cost for the third appraiser shall be borne fifty percent (50%) by LESSEE and fifty percent (50%) by LESSOR. All appraisers shall be MAI appraisers. . . .

. . . In order to exercise the Purchase Option, LESSEE shall give ninety (90) days written notice (the "Option Notice") to LESSOR of its desire to exercise the Purchase Option. The Option Notice shall designate a time, date and place for the closing of such purchase and sale and a date for examination of title. The date for closing such transaction shall, except as provided below, in no event be later than ninety (90) days after the date of the Option Notice . . . . The Option Notice shall be sent by the method provided for notices in this Lease. The Option Notice so sent shall be considered given or made on the date of receipt.

(Joint Ex. 17, at 35, 37–39.)

78. SCI was aware that, even if its interpretation of the lease term prevailed, the 1990 Lease would terminate on December 31, 2015.

79. SCI's established business practices require a multi-month process before final approval is granted to execute a lease purchase option.

80. SCI was required to provide Plaintiff notice of its intent to exercise the Purchase Option on or before October 2, 2015, and thereafter proceed with the express terms of the Purchase Option.

81. The Purchase Option specified how the purchase price would be established by an appraisal process.

82. SCI was well aware that appraisal reports from as many as three MAI appraisers may be required to establish a purchase price.

83.     SCI is experienced in securing appraisal reports. SCI was aware that any one appraisal report may require a minimum of thirty days after the appraiser is retained.

84.     SCI provided notice of its intent to exercise the Purchase Option by letter dated September 25, 2015 ("Notice Letter"). (Joint Ex. 100, at 1.) Plaintiff acknowledged receipt of the Notice Letter on September 26, 2015. (Joint Ex. 123.) The closing period, defined as ninety days after Plaintiff received the Notice Letter ("Closing Period"), expired on December 24, 2015.

85.     The Notice Letter designated that the closing would occur at 11:00 a.m. on December 14, 2015, at the law offices of SCI's counsel. (Joint Ex. 100, at 1.)

86.     Ms. Johnson was responsible for completing the internal steps necessary to secure approval from SCI's management to complete a purchase pursuant to the Purchase Option. Sometime during September 2015, Ms. Johnson identified John Bosworth of Valbridge Property Advisors as a potential MAI appraiser. (Revised Joint Proposed Final Pretrial Order ("Stipulations") ¶¶ (1)(D)(25)–(26).) Mr. Bosworth advised Ms. Johnson that he could deliver an appraisal report within thirty days of being retained. (Stipulations ¶ (1)(D)(26).)

87.     When SCI sent Plaintiff the Notice Letter, Ms. Johnson had not yet received authority to retain Mr. Bosworth. The Notice Letter did not specify SCI's appraiser or ask Plaintiff to approve such appraiser.

88.     On September 26, 2015, Plaintiff's counsel John Martin, without having first consulted with Plaintiff's members, advised SCI's counsel—Glenn Ketner and

Anthony Lathrop—that "since the validity/enforceability of the purchase option will be determined in the pending litigation, we will need to either agree to stay the exercise or have the court address the issue. Please let me know your position." (Joint Ex. 123.)

89. Plaintiff and SCI never thereafter reached an agreement to stay or toll the exercise of the Purchase Option or the appraisal process required by the Purchase Option.

90. On or about October 1, 2015, Plaintiff's members met and advised Mr. Martin that they wished to adhere to the time requirements for the appraisal process as defined by the Purchase Option. Mr. Martin invited further discussion with SCI's counsel on October 2, 2015. (Joint Ex. 125.)

91. On October 14, 2015, Mr. Martin advised SCI's counsel that "the members [of Plaintiff] want to proceed with and complete the appraisal process within the 90 day period since the established purchase price might be acceptable to them. If it is acceptable, then they will want to close within the 90 days." (Joint Ex. 103.) This letter did not unequivocally reject any right SCI would have to compel a purchase at a price established in accordance with the Purchase Option appraisal process.

92. On October 20, 2015, Mr. Martin wrote Mr. Lathrop reiterating Plaintiff's insistence that the appraisal process be completed within the Closing Period, and further stating that "[Plaintiff] understand[s] that an actual closing may not be held until the Court has ruled on the pending issues, but a 'dry' closing should

be conducted with both the sales proceeds and the Deed being placed in escrow." (Joint Ex. 131.) The Court interprets the reference to a "dry closing" to mean that a purchase price would be determined in accordance with the Purchase Option appraisal process and a contingent closing would occur where a deed and the purchase money would be delivered but held in escrow pending the Court's determination of the disputed lease expiration date. If the Court were to determine that the 1990 Lease expired on December 31, 2015, the closing would become final, but if the Court were to conclude that the 1990 Lease expired on December 31, 2014, thereby extinguishing the Purchase Option, the deed and purchase money would be returned.

93. SCI could not tender a binding purchase price without first determining the purchase price in accordance with the Purchase Option appraisal process.

94. On November 2, 2015, SCI, for the first time, advised Mr. Bosworth that it intended to engage him and proceed with an appraisal. (Stipulations ¶ (1)(D)(27).)

95. On November 10, 2015, SCI formally proposed to Plaintiff that the ninety-day Closing Period be extended. Plaintiff rejected the proposal that same day. (Joint Ex. 104.)

96. SCI then proposed Mr. Bosworth as its appraiser and requested Plaintiff's approval as required by the Purchase Option. Plaintiff approved Mr. Bosworth on November 13, 2015. (Joint Ex. 105.)

97. On November 17, 2015, SCI formally retained Mr. Bosworth to complete an appraisal. (Joint Ex. 132.) SCI could not reasonably expect Mr. Bosworth's

appraisal report prior to December 17, 2015, which would be three days after the closing date set in SCI's Notice Letter and only one week before the Closing Period expired.

98. Mr. Bosworth delivered an appraisal report to SCI on December 17, 2015. (Joint Ex. 135.) The appraisal valued the Property at $2,200,000. (Joint Ex. 135, at iii.) SCI provided the report to Plaintiff on December 18, 2015. (Joint Ex. 106.) That same day, Plaintiff delivered Mr. Bosworth's appraisal report to Fitzhugh Stout of Integra Realty Resources, Inc., who Plaintiff had engaged to serve as its appraiser. (Joint Ex. 107.) Mr. Stout, on January 12, 2014, had provided Plaintiff an appraisal report valuing the Property at $3,560,000. (Joint Ex. 120, at 2.)

99. SCI's delivery of its appraisal to Plaintiff on December 18, 2015, precluded time to secure a third appraisal contemplated by the Purchase Option appraisal process. Therefore, the only way a purchase price could be established before December 31, 2015, was for Mr. Bosworth and Mr. Stout to agree on a purchase price.

100. Mr. Stout testified that the differences in both the final appraised values and valuation methodologies between his and Mr. Bosworth's reports were too great to expect any chance at reaching an agreed valuation. Accordingly, a third appraisal would be required to determine a final purchase price.

101. There was not adequate time to secure a report from a third appraiser before the 1990 Lease expired on December 31, 2015, particularly considering the holiday period.

102. No third appraiser was selected before December 31, 2015. No report from a third appraiser could reasonably have been expected prior to December 31, 2015.

103. SCI could have timely established a purchase price pursuant to the appraisal process had it proceeded with due speed.

104. SCI did not, prior to December 31, 2015, request or secure a court-imposed tolling period or a stay of the Purchase Option time requirements.

## IV. CONCLUSIONS OF LAW

105. Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law.

106. The Court has jurisdiction over the parties and the subject matter of this action.

107. The case was properly designated as a mandatory complex business case and assigned to the undersigned, who has authority to make Findings of Fact following the completion of the trial and the submission of all disputed issues for resolution by the Court without a jury.

108. Any Findings of Fact that are more appropriately deemed Conclusions of Law are incorporated by reference as the Court's Conclusions of Law.

109. There is a legitimate controversy, making declaratory relief appropriate as to the proper interpretation of the 1990 Lease, including its initial and renewal term provisions and the enforceability of its Purchase Option. *See Augur v. Augur*,

356 N.C. 582, 588, 573 S.E.2d 125, 130 (2002). The Court's declaration is necessary to settle the legal rights of the parties to the 1990 Lease.

110. In order to secure reformation, Plaintiff bears a heightened burden of proof. *Dorsey v. Dorsey*, 306 N.C. 545, 547, 293 S.E.2d 777, 779 (1982). To establish that reformation is proper, Plaintiff must prove "by clear, strong, and convincing evidence," *id.*, "that a material stipulation, as alleged, was agreed upon by the parties" and "that such stipulation was omitted from [the lease] as written, by mistake, either of both parties . . . or by the mistake of the dra[f]tsman," *Branch Banking & Tr. Co. v. Chi. Title Ins. Co.*, 214 N.C. App. 459, 464, 714 S.E.2d 514, 518 (2011) (quoting *Matthews v. Shamrock Van Lines, Inc.*, 264 N.C. 722, 725, 142 S.E.2d 665, 668 (1965)).

111. Plaintiff has not satisfied its burden and is not entitled to reform the 1990 Lease.

112. The greater weight of the evidence supports that the parties intended to be bound by each of the lease terms, both initial and renewal, as defined by the specific calendar dates stated.

113. The greater weight of the evidence shows that the parties intended and understood that the final termination date of the 1990 Lease would be December 31, 2015.

114. Therefore, the 1990 Lease should be construed and enforced as providing an initial term of January 1, 1990, to December 31, 1995, followed by four

five-year renewal terms, which began on January 1, 1996; January 1, 2001; January 1, 2006; and January 1, 2011, with a final expiration date of December 31, 2015.

115. This conclusion does not depend upon the parties' course of performance. However, the parties' course of performance under the 1990 Lease is consistent with this construction. *See Patterson v. Taylor*, 140 N.C. App. 91, 97, 535 S.E.2d 374, 378 (2000) ("[A] trial court seeking to determine the intent of the parties at the time a voluntary agreement was signed may also consider extrinsic evidence of the conduct of the parties as they carry out the agreement. Indeed, because actions speak louder than words, such evidence may be particularly persuasive. . . .").

116. Because the Court concludes that the 1990 Lease expired on December 31, 2015, it need not further consider SCI's equitable defenses. If the Court were required to consider such defenses, it would conclude that SCI has failed to sustain its burden of proving these defenses. *E.g., Wells Fargo Bank, N.A. v. Coleman*, 239 N.C. App. 239, 247, 768 S.E.2d 604, 610 ("Laches is an affirmative defense which must be pleaded, and the burden of proof is on the party asserting the defense."), *disc. rev. denied*, ___ N.C. ___, 775 S.E.2d 871 (2015).

117. SCI did not plead, and is not now entitled to rely on, a defense based on a statute of limitations or statute of repose. *See Overton v. Overton*, 259 N.C. 31, 35, 129 S.E.2d 593, 597 (1963) ("[T]he [statute] of limitation must be affirmatively pleaded in order to be available as a defense."). In any event, there is no statute of repose that would apply to Plaintiff's action.

118. Plaintiff's October 6, 2014 letter, stating its position that the 1990 Lease would terminate on December 31, 2014, was not a final repudiation of SCI's rights under the Purchase Option so as to excuse SCI's performance in accordance with the terms of the Purchase Option. *See, e.g., Lagies v. Myers*, 142 N.C. App. 239, 253, 542 S.E.2d 336, 345 (2001) (concluding "that defendant never expressed a refusal to honor the [purchase option] agreement and therefore, plaintiff was not excused from tendering the purchase in order to exercise the option").

119. Plaintiff did not waive, and should not be estopped from asserting, its right to insist that SCI establish a purchase price in strict compliance with the stated terms of the Purchase Option. SCI cannot reasonably contend that its delay in establishing a purchase price was expressly or impliedly induced by Plaintiff.

120. Plaintiff is not estopped from claiming that the Purchase Option expired on December 31, 2015, because it had earlier contended that it expired on December 31, 2014. Plaintiff was entitled to proceed on two alternative claims: (1) that the 1990 Lease had terminated on December 31, 2014, thereby extinguishing the Purchase Option, and (2) that if the 1990 Lease did not terminate until December 31, 2015, the Purchase Option had still expired because of SCI's failure to perform.

121. A purchase option is "construed strictly in favor of the optionor." *Sheppard v. Andrews*, 7 N.C. App. 517, 520, 173 S.E.2d 67, 69 (1970). "[A]bsent special circumstances, time is of the essence in an option to purchase land and that acceptance and tender must be made within time required by the option." *Eward v. Kalnen*, 14 N.C. App. 619, 623, 188 S.E.2d 742, 745 (1972). A purchase option "*must*

be exercised strictly as specified by the option agreement." *Lagies*, 142 N.C. App. at 250, 542 S.E.2d at 343; *see, e.g., Miller v. Russell*, 217 N.C. App. 431, 438, 720 S.E.2d 760, 766 (2011) (explaining that the plaintiffs were not entitled to specific performance of the purchase option because they "did not exercise the option according to its terms before the option expired").

122.     SCI "has the burden of demonstrating that [it] exercised the option in accordance with the option's terms." *Lagies*, 142 N.C. App. at 248–49, 542 S.E.2d at 342 (citing *Parks v. Jacobs*, 259 N.C. 129, 130, 129 S.E.2d 884, 885 (1963)).

123.     The 1990 Lease provided that the Purchase Option would not survive the expiration of the lease, and SCI has demonstrated no legal basis to preclude application of that provision. (Joint Ex. 17, at 35.)

124.     SCI was required to, but did not, establish a purchase price by December 31, 2015, as provided by the appraisal process specified in the Purchase Option.

125.     SCI was not excused from its obligation to establish a purchase price prior to December 31, 2015.

126.     SCI did not comply with the closing conditions set by its own Notice Letter.

127.     SCI had not, by December 31, 2015, satisfied all conditions precedent to its right to complete a purchase pursuant to the Purchase Option.

128.     The Purchase Option expired on December 31, 2015.

129.     SCI waived its right to complete a purchase of the Property.

130. In seeking a declaration that it now has a right to complete a purchase pursuant to the Purchase Option, SCI effectively seeks a decree of specific performance. In order to obtain such a decree, SCI must establish that it "has done, or offered to do, or is then ready and willing to do, all the essential and material acts required of [it] by the agreement at the time of commencing the suit." *Carr v. Good Shepherd Home, Inc.*, 269 N.C. 241, 244, 152 S.E.2d 85, 88 (1967) (quoting *Hudson v. Cozart*, 179 N.C. 247, 252, 102 S.E. 278, 281 (1920)); *see, e.g.*, *Lagies*, 142 N.C. App. at 250, 253, 542 S.E.2d at 343, 345 (concluding that even though "several issues remained unsettled at the time the option was to expire," the plaintiff was not entitled to specific performance, because he failed to "exercise the option as specified by the agreement"). Having failed to establish a purchase price in the manner required by the Purchase Option, SCI cannot now require Plaintiff to execute the Purchase Option.

131. SCI is not entitled to any decree that Plaintiff must now specifically close a purchase of the Property.

132. Plaintiff was not legally required to advise SCI prior to October 6, 2014, that it contended that the 1990 Lease would expire on December 31, 2014.

133. SCI has failed to prove that Plaintiff breached any duty of good faith or any implied covenant of good faith.

134. SCI has failed to prove that it suffered damages or that it is entitled to recover damages from Plaintiff.

135. SCI has demonstrated no factual or legal basis that would excuse it from paying double rent beginning on January 1, 2016, as provided by the 1990 Lease.

136. Plaintiff has satisfied its burden of proving that SCI became a holdover tenant on January 1, 2016.

137. Plaintiff is entitled to receive, and SCI is obligated to pay, holdover rent pursuant to the terms of the 1990 Lease for the period beginning on January 1, 2016, and ending on the date that SCI surrenders possession of the Property to Plaintiff, together with interest on that sum at the legal rate.

138. Plaintiff is entitled to the remedy of ejectment. Plaintiff is entitled to possession of the Property, and SCI is obligated to surrender possession of the Property.

139. Each party, having prevailed on one or more of its claims, shall bear its own costs.

## V. CONCLUSION

140. Based on the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Court declares that the 1990 Lease must be interpreted and enforced as having an initial lease term beginning on January 1, 1990, and ending on December 31, 1995, followed by four automatic five-year renewal terms, commencing on January 1, 1996; January 1, 2001; January 1, 2006; and January 1, 2011; with a final lease expiration date of December 31, 2015.

2. SCI remained a lawful tenant until December 31, 2015, and Plaintiff is not entitled to recover double rent for the period of January 1, 2015, to December 31, 2015.

3. The Court declares and adjudges that SCI was entitled to exercise the Purchase Option contained in the 1990 Lease, as long as SCI provided notice of its intent to do so on or before October 2, 2015, and thereafter satisfied its performance requirements before the lease expired, specifically including the obligation to establish a purchase price as defined by the appraisal process, but SCI failed to do so without excuse, and the Purchase Option expired on December 31, 2015.

4. Plaintiff is entitled to recover, and SCI is obligated to pay, holdover rent as calculated pursuant to the terms of the 1990 Lease for the period beginning on January 1, 2016, and ending on the date that SCI surrenders possession to Plaintiff, together with interest at the legal rate.

5. SCI shall surrender possession of the Property to Plaintiff.

6. SCI shall recover no damages from Plaintiff.

7. Each party shall bear its own costs.

Having resolved all claims and counterclaims, this Opinion and Final Judgment constitutes the Court's final judgment.

This the 30th day of March, 2017.


/s/ James L. Gale
James L. Gale
Chief Business Court Judge